## Smith, Banking Commissioner of Kentucky v. Jones.

(Decided February 9, 1917.)

### Appeal from Muhlenberg Circuit Court.

Corporations—Banks and Banking—Rescission of Contract of Stock Subscription—Cancellation of Note For.—Where there has been fraud in inducing a subscription to the stock of a bank, subsequently taken in charge by the State Banking Commissioner on the ground of insolvency, and there has been a failure on the part of the subscriber to exercise care to discover the fraud before the insolvency of the bank became known, and the rights of innocent parties will suffer; then he will not be entitled to relief against the fraud. But where, as in this case, it was made to appear that the fraud was committed, as claimed, at a time when the bank was insolvent and only six months before its insolvency became known; and it was further made to appear that the subscriber for the stock was an innocent victim of the fraud, which he did not discover, and, by the exercise of the utmost care, could not have discovered, before the bank was taken in charge by the State Banking Commissioner, and he received no benefit by way of dividends or otherwise from his purchase of the stock; he was properly held entitled, when sued by the Banking Commissioner upon a note which he had executed in payment of the stock, to a rescission of the contract of subscription and cancellation of the note.

BELCHER & BELCHER for appellee.

TAYLOR, EAVES & SPARKS and WALKER WILKINS for appellant.

OPINION OF THE COURT BY CHIEF JUSTICE SETTLE—
Affirming.

On February 6th, 1915, the Central City Deposit
Bank, a corporation organized under the laws of Ken-
tucky and conducting a banking business at Central
City, was declared by the appellant, Thomas J. Smith,
then Banking Commissioner of the State, and the board
of directors, to be insolvent. Whereupon, the Banking
Commissioner under authority conferred by section
165a, subsection 17, Kentucky Statutes, took charge of
the bank, its property and assets for the purpose of
winding up its affairs, and, to the extent of its assets,
discharging its indebtedness. Among its assets the
Banking Commissioner found a note of $500.00 of date
July 1st, 1914, and due six months thereafter, with in-
terest from its maturity, which the appellee, T. H.
Jones, had executed to the Central City Deposit Bank
for five shares of its capital stock of the par value of
$100.00 per share, which he purchased of C. D. Vincent,
cashier of the bank. Appellee, when requested to pay
the note by the Banking Commissioner, refused to do
so, which caused that officer to bring suit against him
upon the note in the Muhlenberg Circuit Court. The
latter's answer to the petition denied liability upon the
note and alleged that it was without consideration and
its execution by him procured by the following false
and fraudulent representations made by the president
and cashier of the Central City Deposit Bank, viz.: That
the bank was in a solvent and prosperous condition and
its capital stock well worth $1.15, or more, on each dol-
lar thereof, and that the bank was able to pay, and
would lawfully pay, large dividends on such stock; that
he was ignorant of the true condition of the bank and
believed and relied upon the truth of the representa-
tions thus made to him, at the time he purchased the
stock and at all times thereafter, until the bank was
closed by the Banking Commissioner, and was induced
thereby to execute the note in question; that all of the
representations thus made to him by the president and
cashier of the Central City Deposit Bank were false
and fraudulent; were at that time known by them to
be so, and were made for the purpose of defrauding ap-
pellee. The answer contains the further averments that
at the time of appellee's purchase of the stock and de-
livery of the note, the Central City Deposit Bank was

wholly insolvent and its capital stock, including the five shares purchased by appellee, utterly worthless; that appellee only owned the five shares of stock purchased by him a few months before and until the Central City Deposit Bank was closed for liquidation by the Banking Commissioner; that he did not know, and could not, by the exercise of ordinary care, or even the highest degree of care of which he was capable, have ascertained the true condition of the bank, or that its capital stock was worthless, at the time he purchased the five shares for which the note of $500.00 was executed; nor could these facts by any sort of diligence have been known to him at any time thereafter before the bank was taken in charge by the Banking Commissioner, on account of its insolvency; that its insolvency had existed for more than five years prior to the execution of the note sued on and was so skillfully concealed by forgeries and other devices committed and practiced by the president of the bank as to prevent its insolvent condition from being discovered until a few days before it went into the hands of the Banking Commissioner, although repeated investigations of its affairs and business were made by expert bank examiners acting for the State Banking Commissioner. It was also alleged in the answer that the note sued on was void by reason of the fraud practiced by the officers and agents of the Central City Deposit Bank in procuring its execution by appellee. The answer was made a counter-claim and cross-petition against the Central City Deposit Bank and the Banking Commissioner, and by the prayer thereof the rescission of the contract by which appellee became the purchaser of the stock, and cancellation of the note, were asked. All affirmative matter of the answer, counter-claim and cross-petition was controverted by appellant's reply, and the action, by agreement of the parties, transferred to the equity docket and submitted to the court upon an agreed statement of facts which substantially shows:

(1) That the Central City Deposit Bank was insolvent and its capital stock worthless when the note sued on was executed by appellee, and for several years prior thereto.

(2) That appellee's testimony would be to the effect that its insolvency and the worthlessness of its capital stock was unknown to him and all others, except the bank's president, and was so concealed then, and down

to within a few days of the Banking Commissioner's taking charge of the bank, by means of notes forged by its president, purporting to be of sufficient value to render the bank solvent and prosperous, as to prevent detection by expert examiners of the Banking Commission, notwithstanding their repeated examination of the bank, one or more of which was made after execution by appellee of the note sued on.

(3) That appellee was induced to purchase the five shares of capital stock of the Central City Deposit Bank and execute his note for same upon the representations of C. D. Vincent, its cashier, that it was then, and would continue to be, in a solvent and prosperous condition, its capital stock worth $1.15 on each dollar of par value thereof, and that the bank would legally pay large dividends to the owners of such stock; that the representations of the cashier, Vincent, were supported by the following writing, signed by the president of the bank, which Vincent then showed and delivered to appellee, viz.:

"The Central City Deposit Bank has just paid a thirty per cent. stock dividend, thereby increasing our capital stock from $25,000.00 to $32,500.00. We have also been authorized a capital of $40,000.00, consequently have $7,500.00 worth of stock for sale. This stock our Mr. C. D. Vincent will offer to selected people at par, $100.00 per share, and since we have a surplus fund of $5,000.00, and an undivided profit account, our stock is worth more than $115.00 book value per share at the present time.

"I am, very respectfully."

(4) That the foregoing statements of Vincent and those contained in the writing from the president were false and known to the latter, if not to Vincent, to be false, but were believed and relied on by appellee, who was induced thereby to purchase the five shares of capital stock and execute his note therefor, which he would not have done but for such representations.

(5) That appellee, during the few months he was a stockholder in the Central City Deposit Bank, was never present at any meeting of the directors or stockholders thereof; was never notified of any such meeting, and had no knowledge thereof.

(6) That appellee was, and is, unacquainted with the signatures of any of the persons whose names are

said to appear upon the forged notes held by the Central City Deposit Bank, and that the president of the bank is now serving a term in the state penitentiary under a voluntary plea of guilty to an indictment charging him with the forgery of one of the notes found in the bank when taken charge of by the Banking Commissioner; and there are now pending in the Muhlenberg Circuit Court other indictments against the president charging him with other forgeries made by him, as president of the bank, for the purpose of concealing its insolvency.

By the judgment rendered the circuit court rescinded the contract whereby appellee had become the purchaser of the five shares of bank stock; cancelled the note which he executed therefor, and dismissed the appellant's petition at his cost. Being dissatisfied with the judgment, the Banking Commissioner appealed.

It is patent from the foregoing agreed statement of facts that the Central City Deposit Bank was insolvent when it sold to appellee the stock for which he gave it his note; that its insolvency was known to its president, at whose instigation the cashier, armed with the letter furnished by him, containing the numerous false statements as to the solvency of the bank and its prosperous condition, sought out and defrauded the appellee by selling him the worthless stock and procuring his note therefor. Whether the cashier had knowledge of the insolvency of the bank or of the falsity of the representations contained in the letter referred to, and made by him as well, which induced appellee to purchase the stock and execute the note, is not material. The falsity of the representations and the circumstances attending the perpetration of the fraud demonstrate, that it was deliberately planned by the president and executed through the agency of the cashier.

It is equally patent from the agreed facts that appellee was wholly ignorant of the insolvency of the bank at the time of the transaction in question and down to the time of its declared insolvency by the State Banking Commissioner, February 6th, 1915, seven months after his purchase of the stock, and one month after the maturity of his note; and that during this interval of seven months no sort of diligence upon his part, not even the greatest that could have been exercised by a person of ordinary prudence and capacity, would have enabled

him to discover the insolvency of the bank, the worthlessness of the stock he had purchased, or the fraud that was perpetrated upon him in the sale thereof. It does not appear from the evidence furnished by the agreed facts that during this period of seven months, or at any time prior thereto, there existed in Central City, Muhlenberg county, or elsewhere, any doubt as to the integrity of the president and other officers of the bank, any rumor as to the insolvency of the bank, or even a suspicion in the mind of a single individual that it was not a solvent and prosperous institution. Indeed, with such skill did its president, by the use of forged notes or other devices, conceal the true condition of the bank that not even repeated investigations of its affairs by bank examiners disclosed its insolvency; and it was not until within a day or two of February 6th, 1915, that its true condition was discovered from the final investigation then made by the examiner, which resulted from the accidental discovery of the forgeries by one or more persons, whose names had been used in committing them.

It is also to be remarked that appellee never received any dividends upon his stock, was never a director of the bank, and never attended, or was notified to attend, a meeting of its stockholders, nor does it appear that during the few months of appellee's possession of the stock purchased by him from the bank, or that during the bank's possession of the note executed by him for such stock, it incurred any additional indebtedness by reason of its having the note or holding it out as an asset of the bank.

Without further discussion of the facts, it is sufficient to say that they seem to fully entitle appellee to the relief granted him by the judgment of the lower court, as they show that his purchase of the stock of the bank and the execution of his note therefor, were induced by false and fraudulent representations upon the part of its officers, and, at the same time, fail to show any want of diligence on his part, either in discovering the fraud or in taking steps to obtain relief therefrom, when the fraud was discovered. This being true, the case comes clearly within the rule announced by us in the cases of Kentucky Mutual Invest. Co.'s Assignee v. Schaefer, &c., 120 Ky. 227, and Reid v. Owensboro Savings Bank & Trust Co., 141 Ky. 444.

In each of these cases it was, in substance, held that where there has been fraud in inducing a subscription to stock, and there has been a failure on the part of the person subscribing for the stock to exercise care to discover the fraud, and the rights of innocent parties will suffer, then he whose negligence has caused the loss should bear it, but where the subscriber for stock is in no fault and is himself, the innocent victim of a fraud, which he did not, and could not, discover before the perpetrator of the fraud failed, he will be entitled to relief against the consequences of such fraud. In Ky. Mutual Invest. Co. v. Schaefer, &c., the purchaser of the capital stock of the corporation was held entitled to a rescission of the contract of purchase, because the contract was procured by the fraud of the corporation's officers, when it was insolvent, and but "a few months" before its insolvency was disclosed by an assignment for the benefit of its creditors, and that the purchaser had not failed to exercise due care to discover the fraud. In Reid v. Owensboro Savings Bank & Trust Co., the rescission of the purchases of stock was refused because there had been a sufficient length of time before the bank was placed in the hands of a receiver to afford the purchasers thereof ample opportunity to investigate and ascertain the condition of the bank, and take such action as would have enabled them to obtain relief against the fraud which had been practiced by the officers of the bank in the sale to them of the stock. In distinguishing that case from the Schaefer case we, in the opinion, said:

"This case (Ky. Mutual Invest. Co. v. Schaefer, &c.) although strongly relied upon by counsel for appellants in support of their contention that they should have a rescission does not in our opinion meet the question here presented. In that case Schaefer became a stockholder in the Kentucky corporation only a few months before it went into liquidation. It does not appear that he had any time or opportunity to inquire into its affairs before it became insolvent, or that he derived any benefit from his connection with it. He was not guilty of any laches, nor chargeable with lack of diligence in any respect. But, in the case before us, both of the complaining stockholders subscribed for a part of their stock in the corporation more than two years before it went into liquidation, and Reid became the owner of a part of

his stock more than one year before the bank became insolvent. During this time they not only had the right but ample opportunity to investigate and ascertain the condition of the bank and take such action as appeared to them to be necessary to protect their interest, but they were content to accept as true the representations as to the condition of the bank made by its officers and receive regularly large dividends on their stock.

"It is furthermore entirely probable that persons were influenced to give the bank credit or put their money on deposit with it upon the faith of the knowledge that these shareholders were interested in it, as it is a matter of common knowledge that corporations do obtain credit and do get business from friends and acquaintances of stockholders on the strength of their connection with it. Nor should it be overlooked that the officers of corporations are elected by the stockholders, whose agents they are, and that these stockholders have the power to remove them at pleasure. While creditors and depositors have not the privilege of either inspection or control. They must as a rule act on appearances. They generally take it for granted that the stockholders would not select or retain men to manage their corporate affairs unless they were capable, honest and prudent. They depend for protection in a measure at least not only on the character and standing of the officers, but their knowledge of the stockholders as well. And so it seems to us that every consideration of justice demands that when it comes to a question whether the stockholder who has been guilty of laches, or the innocent creditor shall suffer, that the stockholder should bear the loss. So that while adhering to the rule laid down in the Schaefer case, we are not disposed to extend the doctrine therein announced so as to enable the stockholders to have a rescission after insolvency proceedings have been instituted when he has not been diligent to protect his rights and when to grant him such relief would be prejudicial to creditors. . . . ."

The analogy between the facts attending the purchase by the appellee, Jones, of the stock of the Central City Deposit Bank, as presented in the instant case, and those with respect to the purchase of the stock, shown in Ky. Mutual Invest. Co. v. Schaefer, &c., is obvious. As in the case of Schaefer, Jones, after his purchase of the stock of the Central City Deposit Bank, had neither time

nor opportunity to inquire into its affairs or discover its condition before it became insolvent; nor did he derive any benefit in the way of dividends, or otherwise, in consequence of his purchase of the stock; nor was he guilty of any laches or chargeable with any lack of diligence in any respect. Hence, he was clearly entitled to the relief given him by the judgment of the circuit court.

While in England, and some of the states of this country, the courts seem to be committed to the doctrine that a stock subscription cannot be repudiated on the ground of fraud after the corporation has become insolvent and made an assignment, though the fraud was not discovered before insolvency and there was no laches in failing to discover it, it is manifest that the qualification given the doctrine in Ky. Mutual Invest. Co. v. Schaefer, and Reid v. Owensboro Savings Bank & Trust Co., *supra*, is the rule of law obtaining in this jurisdiction; which rule is, that, where a subscriber for stock is the innocent victim of the fraud, practiced upon him in procuring the subscription, he is not estopped to obtain relief against the fraud after the insolvency of the bank or other corporation has been declared; provided, he derived no benefit from his purchase of the stock and did not discover, and, by the exercise of the utmost care, could not have discovered, the fraud before the bank or corporation became insolvent. The above rule, as shown by the following cases, seems to have been also approved in several other jurisdictions. Gress v. Knight (Ga.) 31 L. R. A. (N. S.) 900; Newton Nat. Bank v. Newbegin, 33 L. R. A. 727, 20 C. C. A. 339, 40 U. S. App. 1, 74 Fed. 135; Meholin v. Carlson, 17 Idaho 342; Chamberlin v. Trogden, 148 N. C. 139; Fear v. Bartlett, 81 Md. 435.

As the application of this rule to the pleadings and agreed facts appearing in the record before us, establishes the correctness of the conclusions reached by the circuit court, the judgment is affirmed.