### Palmer, et al. v. Citizens Bank of Murray, et al.

(Decided February 1, 1918.)

#### Appeal from Graves Circuit Court.

Banks and Banking—Fraudulent Sale of Stock—Rescission.— Where one is induced by the false and fraudulent representations of an officer of a banking corporation to make a purchase of its stock, he may, while the bank is solvent, by bringing an action within a reasonable time after the discovery of the fraud, have a rescission of his contract of purchase, or recover damages for the fraud, but he can not obtain relief if he does not commence his action until the bank has become insolvent or its affairs have gone into liquidation because of insolvency, unless his purchase of the stock has been so short a time before the insolvency, that he has had no reasonable opportunity or time to investigate its affairs and discover the fraud, and has received no dividend or other return for his investment in the stock.

ROBBINS & ROBBINS for appellants.

RAINEY T. WELLS and WELLS & KEYS for appellees.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

On the 15th day of August, 1913, the appellant, J. I. Palmer, bought from the Citizens Bank of Murray, twenty shares of its capital stock, of the par value of $50.00 each, and gave for it the sum of $55.00, per share, or $1.10 for each dollar of the par value of the stock. He paid for the stock by transferring to the bank certain

promissory notes, which he held against individuals, one of which he held against the appellants, B. H. Cobb and Willie Cobb, payment of which note was secured by a mortgage upon real estate in the county of Graves. On the 26th day of October, 1914, the bank instituted a suit, in the Graves circuit court, against the Cobbs, to secure a personal judgment against them upon the note and an enforcement of the mortgage lien in satisfaction of the judgment. The Cobbs filed an answer, in which they denied that Palmer had ever transferred the note to the bank or sold or assigned it to it, or that the bank was now the owner of the note or the mortgage lien to secure it, but that the bank had procured the note from Palmer by fraud and without giving any consideration therefor, and that on the 10th day of November, 1914, they had paid to Palmer the sum of $100.00, as a credit on the note. The affirmative averments of the answer were denied by a reply. On the 9th day of July, 1915, the appellant, Palmer, filed his petition to be made a party defendant and asked that it be taken as his answer and counter-claim against the Citizens Bank, and a cross-petition against the Cobbs, The appellant, Palmer, averred in his petition, which was made an answer and counter-claim, that he had transferred the note, which the Cobbs had executed to him, to the bank in payment for twenty shares of the capital stock of the bank, and that he was induced to purchase the stock by a false statement of the financial condition of the bank, which was published in the newspapers, and, also, by representations, which the cashier of the bank had made to him when proposing to sell him the stock, to the effect, that the bank had sufficient assets to pay all of its debts and liabilities, and to make its capital stock worth one hundred and ten cents on the dollar, and that at the time the cashier made this statement, he knew that it was false and untrue, and made it with the intention of perpetrating a fraud upon him and to induce him to purchase the stock; that he believed the statement and relied upon it and was induced thereby to purchase the stock and in payment to transfer the note against the Cobbs to the bank; that the bank, at the time he purchased the stock, was insolvent and did not have assets sufficient to pay its debts and liabilities, and that the stock was of no value whatever. He tendered the certificate of stock to the bank and asked the court to rescind the contract by which he had purchased the stock, and to adjudge that he was

entitled to a return of the note against the Cobbs, and for a judgment thereon against the Cobbs. The bank, by a reply, traversed the affirmative allegations of appellant's answer, and further plead, that more than one year had elapsed since the purchase of the stock by appellant and before the commencement of the action and offered that as a plea in bar to appellant's action to rescind the contract for the sale of the stock, having further plead, that on the 26th day of October, 1914, by a resolution of a majority of its board of directors, that the bank had been placed in the hands of the banking commissioner for the liquidation of its assets and for a settlement wth the creditors of the institution. By agreement of parties, the affirmative allegations in the reply of the bank to the answer, counter-claim and cross-petition of Palmer were taken as controverted upon the record. Proof by depositions was taken and upon a submission of the cause, the court adjudged that Palmer had not manifested his right to the relief sought and dismissed his counter-claim and cross-petition and rendered a judgment in favor of the bank against the Cobbs for the amount of the note sued on, and, also, for the enforcement of the mortgage lien for the satisfaction of the judgment, and from this judgment J. I. Palmer, B. H. Cobb and Willie Cobb have appealed.

The Citizens Bank was a financial institution, which had been in existence for a number of years, with a paid up capital stock of $20,000.00, and on June 20th, 1912, the capital stock was increased by a resolution of the board of directors to $30,000.00, and afterwards, on May 31st, 1913, a resolution of the board of directors was adopted, providing for the increase of the capital stock to $40,-000.00 and it was twenty shares of the new stock ordered to be sold at the latter date, which appellant bought. The last statement previous to the purchase of the stock by Palmer was published on the 18th day of June, 1913, as of June 4th, previous thereto. At the time this statement was published the capital stock was $29,400.00. About fourteen months after Palmer purchased the twenty shares of stock, the bank became in an unsatisfactory condition, and its board of directors placed it in the hands of the banking commissioner, and thereafter it was in charge of J. D. Rowlett, a deputy banking commissioner, who undertook to convert its assets into money and to pay the liabilities of the institution, and he testifies that

with what he had already collected and paid out, the assets would be sufficient to pay all the debts of the bank of every kind in full, and would pay about forty per centum to the stockholders.

Although about fourteen months had expired after Palmer had purchased his stock until the bank went into liquidation, it does not appear that he ever received any dividend upon his stock, and whether he had any reasonable opportunity of discovering the financial condition of the institution at the time of his purchase, before it went into liquidation is conjectural. Hence, the first question to be determined in this entire case is, whether or not the stock was materially less in value at the time Palmer purchased it, and the further question is, whether he was induced to do so by any false representations by the cashier of the bank, upon which he was induced to become the purchaser. While Palmer testifies to having seen the statement published by the officers of the bank of its financial condition, as of June 4th, 1913, he explicitly says twice in his testimony that he did not rely upon that in his purchase of the stock, but that he relied alone upon the representations made to him by the cashier of the bank. He says that the statement showed that the stock of the bank was worth one hundred and fifteen cents to the dollar of its par value, but in this he is evidently mistaken, because the statement shows that the liabilities and assets of the bank balance, and the statement further shows, that the bank at that time did not have any surplus assets, but does show that it had undivided profits to the amount of $1,318.00 with a capital stock of $29,400.00. Hence, if the other items of the statement of the assets and liabilities were correctly given, the stock, according to the statement, was worth about five cents to the dollar in excess of its par value. The cashier of the bank, whose testimony was given, states that was the value of the stock when the statement was made, and there was no effort made to show that any item of the statement was incorrect, or that any of the assets were of less value than given in the statement. No reasons are given for insisting that the statement was incorrect, but it is drawn from the testimony of the cashier and a former president of the bank, that several years previous to the purchase of the stock by Palmer, the bank loaned funds to the amount of $5,000.00, which were considered "bad" debts, and that some portion of this sum was charged off the

books. A portion of it was swapped for $2,500.00, par value, of the bonds of a street railway in Owensboro, which were thereafter carried as assets of the bank, at a valuation of $2,000.00, and a portion of the "bad" debts was charged to improvements upon the bank's real property. It is insisted that the $2,500.00 of the bonds of the street railway are worthless, but no evidence in the record shows that their value is less than $2,000.00, the amount at which they were estimated, and the only evidence of their value is, that the interest of six per centum per annum, payable upon these bonds, is and has been regularly paid, which would indicate that they were of the value at which they were carried as assets. There is no explanation of why or for what reason or in what way a portion of the "bad" debts were charged to improvements made upon the real property of the bank, and it is not certain that an understanding of what is meant has been arrived at, but it seems that it was an attempt to cover up a portion of the losses by an increased valuation of the real property. When this increased valuation was made does not appear, but it seems to have been done because of certain improvements made, and there is an entire lack of any evidence to the effect, that the real property was estimated in excess of its value in the statement of June 4th, 1913. It is further complained, that on June 12th, 1912, when it was resolved to increase the capital stock from $20,000.00 to $30,000.00, there was a surplus on hand of $7,000.00, and that the stock was then worth thirty cents to the dollar, above par; that a dividend was declared and this surplus was paid out to the then stockholders so that the old and new stockholders would be upon an equality. While the payment of this dividend reduced the value of the stock from one dollar and thirty cents to par, the new stock was sold at par, and on June 4th, the stock had increased in value to one dollar and five cents, as represented in the statement of that date. It is impossible to see what influence the declaration of this dividend has upon the issues, in the instant case, in any way, as the statement of June 4th, which appellant claims to have seen, shows that the bank then had no surplus in any amount, and besides, the appellant expressly declares that he did not rely upon the statement, and was not induced by it to make the purchase of the stock. The above are the only facts shown, from which it could be inferred, that the stock was not of the value, which it was,

by the statement, estimated to be worth on June 4th, and they fail to prove that the statement was incorrect.

The real and only decisive question is, was the stock practically of the value, which it was represented to be by the cashier on August 15th, 1913, the date of its purchase by appellant? The fact, that it thereafter became worthless or deteriorated in value, would not constitute a ground for rescission; if it was really of the value stated at the time of the sale. Goad v. Lewis, 174 Ky. 394. The principle, which applies to a transaction of this kind is, if a stockholder is induced by false or fraudulent representations of the officers of a corporation to buy its stock, he may, while the corporation is solvent, by an action brought within a reasonable time after the fraud is discovered by him, secure a rescission of his purchase upon such terms as are equitable, or recover such damages as he has sustained by the fraud. He can not obtain relief if the action is not commenced until the corporation has become insolvent, or until proceedings have been instituted for the liquidation of its affairs, unless he had become a stockholder so recently before the insolvency that he had not had reasonable time or opportunity to investigate its affairs and discover the fraud, and had not received any dividend or, other return for his investment in the stock. The reason given for the latter part of this rule is, that if he waits until the corporation becomes insolvent or its affairs are in course of liquidation, his attempt to secure a rescission or damages for the fraud, which had been perpetrated upon him, would affect the rights of the creditors of the institution. Reed v. O. S. B. Co., 141 Ky. 451; Kentucky Mutual Investment Co. v. Shaefer, 120 Ky. 227; Smith, Banking Commissioner, etc., v. Jones, 123 Ky. 776; Deppen v. German American Title Co., 24 R. 1876. Although the appellant states in his counter-claim, that the cashier of the bank represented to him that the book value of the stock at the time of his purchase was one dollar and ten cents, he states in his deposition, that the representation made to him by the cashier was that its value was one dollar and fifteen cents. He, however, says that the cashier told him that the bank had agreed to sell the stock during that year at one dollar and ten cents. The cashier contradicts this statement to the extent that he represented to him that the value of the stock was one dollar and fifteen cents, and assigns as a reason for it, that there was no reason for him making

such statement, as the books did not show it to be of that value, but that the books did show that the value at that time of the stock was one dollar and seven cents. The cashier, furthermore, shows by his testimony, that the amount above par, at which, this stock was sold was credited to the surplus, and that interest, which was due the bank and which had not been credited to the surplus or any other fund, at the time of the statement made on June 4th, after that time and before the purchase by appellant had been credited to the surplus and which had increased the surplus and undivided profits to the sum of $3,655.00 on the 15th day of August. No other change appears in the items, which constitute the assets of the bank, at that time from what it was on June 4th, and no attempt is made to show that any other change had occurred in the items of assets at that time, and if this statement is true, and there is no other evidence upon which to rely, the value of the stock, at the time the purchase was made by the appellant, was practically that, which he says that the cashier represented it to be. The cashier is called upon and files with his deposition a list of all the uncollected indebtedness, which was owing the bank on the 15th day of August, 1913, and which had not been collected at the time of the giving of his deposition, and the deputy banking commissioner is required to file a list of all uncollected indebtedness owing to the bank by individuals and corporations and which, in his opinion, are solvent and collectible, which he did, and a comparison of the two statements shows that no asset of the bank, in the way of a loan or discount, at the date of the purchase of the stock by appellant, remains uncollected, except such as the deputy banking commissioner states are solvent and collectible. Hence, the appellant fails to show that he was induced by any false representation, as to the solvency of the bank or the value of the stock, at the time he made the purchase, and it is unnecessary to determine, for the purposes of this case, whether he had had reasonable opportunity to discover any fraud that had been perpetrated upon him before the bank became insolvent or its affairs were placed in liquidation. The statement of the assets and liabilities of the bank, which were given by the deputy banking commissioner, were of a time more than a year after the purchase of the stock by appellant, and the fact that the bank was not then entirely solvent, or that the stock was not then of

the value it was represented to appellant to be when he purchased it, while it is some evidence tending to show its value and condition at the time of the purchase, it is not a controlling circumstance by which to determine the value of the stock and the condition of the bank at the time the purchase was made.

The judgment is therefore affirmed.