## Dennis v. Thomson et al.

(Decided October 27, 1931.)

WOODWARD, HAMILTON & HOBSON and WILBUR FIELDS for appellant.

BRUCE & BULLITT and LEO WOLFORD for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

This action is for damages for alleged false representations whereby the appellant, Holmes V. M. Dennis, Jr., as he alleges, was induced to purchase stock in the Chemical Fuel Company of America, which proved valueless. It was instituted against the Chemical Fuel Company of America and W. A. Thomson, Jr.

The trial court sustained the company's demurrer to the petition. On a review of the ruling of the court on this demurrer, we find that the petition may be considered as stating facts sufficient to constitute a cause of action against it, except for the presence of a certain allegation therein. It is alleged that the company at the time of the sale of the stock to appellant, and continuously since, and at the institution of the action, was insolvent, and that it had ceased to function long prior thereto. Such an allegation brings this case as to the company within the rule enunciated by this court in Palmer et al. v. Citizens' Bank of Murray et al., 179 Ky. 54, 200 S. W. 41, 43; Deppen v. German American Title Company, 70 S. W. 868, 24 Ky. Law Rep. 1110; Smith, Banking Commissioner, v. Jones, 173 Ky. 776, 191 S. W. 500, L. R. A. 1917C, 890; Reid v. Owensboro Savings Bank, 141 Ky. 444, 132 S. W. 1026; Fletcher American Co. v. Culbertson, 215 Ky. 695, 286 S. W. 984; Preston v. Jeffers, Receiver, 179 Ky. 384, 200 S. W. 654; Robert-

son v. Owensboro Savings Bank, 150 Ky. 50, 149 S. W. 1144; Little v. Owensboro Banking Company, 150 Ky. 331, 150 S. W. 334.

In Palmer v. Citizens' Bank of Murray, supra, we stated the rule in this language:

"The principle which applies to a transaction of this kind is, if a stockholder is induced by false or fraudulent representations of the officers of a corporation to buy its stock, he may, while the corporation is solvent, by an action brought within a reasonable time after the fraud is discovered by him, secure a rescission of his purchase upon such terms as are equitable, or recover such damages as he has sustained by the fraud. He cannot obtain relief if the action is not commenced until the corporation has become insolvent, or until proceedings have been instituted for the liquidation of its affairs, unless he had become a stockholder so recently before the insolvency that he has not had reasonable time or opportunity to investigate its affairs and discover the fraud, and had not received any dividend or other return for his investment in the stock. The reason given for the latter part of this rule is that, if he waits until the corporation becomes insolvent or its affairs are in course of liquidation, his attempt to secure a rescission or damages for the fraud, which has been prepetrated upon him, would affect the rights of the creditors of the institution."

It is apparent that it is our view that the trial court did not err in sustaining this demurrer to the petition.

We are required to review a trial of the case by the court with a jury as to the appellee W. A. Thompson, Jr., wherein a peremptory instruction was given at the close of the evidence in his behalf. A verdict was accordingly returned, favorable to him; an order entered dismissing the original, amended, and substituted and second amended petition, and from which appellant appeals.

The story presented in this case is neither a new nor an unusual one. Its interpretation and the application of the law to it require a statement of the issues and resume of the evidence adduced on the trial.

For his cause of action appellant relied upon certain alleged false representations which are alleged to

have been made to him by W. A. Thomson, Jr., and a Mr. Heath, which are substantially as follows:

"(a) That the corporation had authorized 20,000 shares of 7% cumulative preferred stock, and 10,000 shares of 6% preferred, and 20,000 shares of common stock, all of the par value of $100 per share.

"(b) That of the total stock approximately 6,000 shares of each class were then owned by the original subscribers.

"(c) That each of the subscribers had not paid the full par value of and for said stock to the corporation, nor were they the owners of as much as 2000 shares of either class of the corporation.

"(d) That the corporation had profitable contracts for its alleged product with the General Petroleum Company of Los Angeles, California, and the Inter-Ocean Oil Company of Baltimore, and that like contracts were being or had been prepared between it and the Tide Water Oil Company of Bayonne, and the White Star Oil Company of Los Angeles for the installation and operation of its equipment in their refineries on a royalty basis.

"(e) That such contract 'would pay to the corporate defendant an annual revenue of $4,000,000.'

"(f) That the defendant corporation maintained a plant of 1000 barrels capacity at Louisville, Ky., properly equipped, and another large plant at Newark, N. J., and that the company had expended in these improvements in excess of $600,000, which sum they represented to the plaintiff had been supplied by the individuals composing the original subscribers.

"(g) That the defendant Thomson had been authorized by the corporation to offer a limited amount of the units of its stock for sale at the price of $300 for one share of stock or multiples thereof.

"(h) At the time of the sale it was represented, that the Chemical Fuel Company of America had satisfactorily operated an experimental refining plant of one thousand (1000) barrels capacity in Louisville, Kentucky, that an additional plant was built at Newark, N. J., for the purpose of further developing the process; that its process and method of operating were completely standardized at the plants. . . .

An issue was formed by appropriate pleadings.

The evidence heard to sustain the charge of fraud may be summarized as follows: It is stated in the prospectus:

"That the present offer (of stock) is limited to 2000 shares of each class, subject to prior sales. Subscriptions will be taken for lots of one share of each class of stock or multiples thereof, at $300 the block. . . .

"The company's first operation consisted of an experimental plant of 1000 barrels capacity in Louisville. Results at this refinery were satisfactory and a similar installation erected at Newark, N. J. Here a completely standardized unit was operated for a period of months. . . . Sustained performance has shown the process to be technically successful. Contracts have been entered into with the following companies: General Petroleum Company of Los Angeles, Inter-Ocean Oil Company of Baltimore. Contracts are also awaiting signatures with the following companies: Tide Water Oil Company of Bayonne, White Star Oil Company of Los Angles, for the installation and operation of its equipment in their refineries and on a royalty basis. . . . The process of the Chemical Fuel Company, though complex in theory is very simple in design. . . . Patents on this process have been taken out and are now the property of the Chemical Fuel Company. . . . E. W. Stevens, inventor of the process, formerly with the U. S. Bureau of Mines. . . . The Company first built an experimental plant of one thousand (1,000) barrels capacity in Louisville, Ky. This plant was equipped with storage, tank cars, necessary dehydrating machines &c., to handle oil products in the many stages of their development. Up to this point and covering a period of two years, the company has expended in excess of over $600,000.00. These funds were supplied by the individuals composing the original subscribers. The present offering is the first of the company's securities to be offered for public distribution. The funds to be derived from the security offered are to be used for construction and furtherance of our existing contracts. . . . The commercial unit has been successfully run by num-

erous engineers. . . . The plants of the corporation have been standardized.''

It is shown by the record of the board of directors that, instead of authorizing the offering for sale of 2,000 shares of each class, subject to prior sales, subscriptions in lots of one share of each class of stock or multiples thereof at $300 a block, it had delegated only authority to the appellee ''to sell outside the state of Kentucky not exceeding 1000 shares of preferred, debenture and common stock on the basis of net royalties to the company of not less than $80.00 per share, and a like amount of debenture and common stock to go with the sale as a bonus.''

It is shown by the evidence that, instead of the ''present offering'' being ''the first offering of its stocks,'' Converse D. Marsh, prior thereto, had made other sales, or had offered the stock for sale.

It is further shown that, instead of owning or possessing $600,000 worth of property, even if such sum had been theretofore expended for improvements, it did not at that time own same, but that the company was in such financial straits that, at a meeting of the board of directors on July 30, 1923, a resolution was adopted stating that the company was embarrassed by the lack of funds to carry on its business, and that to supply this immediate and urgent need the board of directors were authorized to mortgage the property of the company. It is further shown by its record that on May 29, 1923, the appellee W. A. Thomson, Jr., as director and secretary of the corporation, had resigned to the board of directors, and his resignation had been accepted by it.

Mr. Martin, during the time the corporation was functioning, was its treasury and a member of its board of directors. He testified that the primary purpose of the organization of the Chemical Fuel Company of America was to ''develop a set of patents issued originally to Mr. Stevens for a cracking process for cracking crude oil into gasoline.'' It was manufacturing motor fuel under the name of ''trioxoline''; the ''cracking process was never commercially developed.''

Judge Kirby stated, ''The original stockholders invested money in the company on the strength of their faith in the Stevens patents''; the corporation was manufacturing and had sold ''trioxoline''; he paid nothing for his stock.

J. P. Thompson's testimony disclosed the corporation had a plant on Eastern parkway, Louisville, Ky., at which it was making "trioxoline" which is made "out of good oil dried out, supposed to make motor fuel better than any gasoline." At this plant (Eastern parkway) "there were no experiments made with the Stevens' patents for cracking gasoline." The corporation "had a plant on Eastern parkway which might have had that capacity (1,000 barrels), but not practically." It owned a lot with buildings on it, and certain equipment, where the Eastern parkway plant was located, with a mortgage on it for an amount in the neighborhood of $50,000 or $75,000.

D. W. Wood, secretary of the General Petroleum Corporation, stated that no contract existed between the General Petroleum Corporation and the Chemical Fuel Company of America; that if such contract had been executed it would not only have been prepared in his office, but it would have reposed in the files of his office; that was the regular course of dealing that was always maintained by the company.

Samuel J. Dickey, consulting engineer and manager of manufacturing of the General Petroleum Corporation of California, stated:

> "A contract was submitted to our San Francisco office, legal department, for their comments, and certain comments were made. The comments suggested many changes. These changes were never made, nor fully negotiated or further negotiated with the representatives of the Chemical Fuel Company."

The General Petroleum Corporation of California "never made an experiment under the Stevens patents." A shipment of an apparatus "consisting principally of five-gallon cans, five-gallon empty bottles, along with some electrical equipment (in the judgment of the witness) not sufficient to use for a test under the Stevens patents." He stated that in a conversation with Thomson, he (Thomson) said to him "that the apparatus was insufficient to make a test of his process." No contract ever grew out of the negotiations between the representatives of the Chemical Fuel Company of America and the General Petroleum Corporation of California.

Edward A. Suter, cashier of the Inter-Ocean Oil Company, incorporated as a part of his testimony a

written contract purporting to have been entered into on the 27th day of December, 1922, between the Chemical Fuel Company of America and the Inter-Ocean Oil Company, a corporation operating in the state of Maryland. It recites "that the aparatus is now in the possession of the General Petroleum Company of California, and it is agreed between the parties to the contract that such parts which are now in use, or similar parts, are to be shipped as soon as conveniently possible from California or elsewhere, to the Inter-Ocean Oil Company, East Brooklyn, Baltimore, Md., and when it arrives the Inter-Ocean Oil Company will conduct experiments therewith for a sufficient period of time to demonstrate the adaptability of said Stevens Cracking Process," in the treatment of certain designated oils. It is further agreed in the contract that, in the event the experimental tests should test the certain oils and distillates with which the Inter-Ocean Oil Company should experiment into commercial gasoline to the extent and in the proportion therein mentioned equal to the gasoline sold on the markets, to be determined by the Inter-Ocean Oil Company, then the Inter-Ocean Oil Company would operate the plant or plants for the purpose of converting oil and pay to the Chemical Fuel Company, a royalty for the use of such patents and rights.

George M. Heath testified that he met the appellee in the office of Converse D. Marsh in New York City, and the appellee represented himself as secretary of the Chemical Fuel Company of America, and offered him 15 per cent commission if he would sell some of its stock. He supplied him with the printed prospectus, containing the names and addresses of the officers, including his own, and stated to him the division of stock forming the unit, with its sale price; that appellee agreed to allow and to pay him 15 per cent of the proceeds of completed sales made at the price stated in the prospectus. He reported the sales of stock which he made to Watson, Rogers, and appellant to the appellee. He (Heath) made by virtue of his contract with appellee, the sale of stock to appellant at the rate of one share of its 7 per cent cumulative preferred, one share of its 6 per cent preferred, and one shore of its common stock for $300 for the block of three shares; that he made to appellant the representations "given in the prospectus" to induce him to purchase the stock; that he received from appellant a check payable to himself for $1,500, which he subse-

quently indorsed and delivered to the appellee, he retaining the proceeds, and paying to him (Heath) 15 per cent commission. The appellee at the time had two rooms in connection with Marsh's office on which he paid rent, and used Marsh's stenographer and telephone. The witness Heath disclaimed having any knowledge of the Chemical Fuel Company of America, except as it was imparted to him by the appellee.

When on the witness stand, the appellee admitted knowing the witness Heath, but claimed he (Heath) worked for and with Converse D. Marsh, a broker in New York, and who at one time had a contract with the Chemical Fuel Company to sell its securities in New York state. The stock sold to appellant was "treasury stock" owned by the corporation and kept in the treasury at the time of the sale. He made in his testimony this statement: "Well, now when we would sell a share of stock, Marsh would send the money back to Martin, and Martin would issue the stock of course, physically issue the stock and send it back." He testified that the certificate of stock issued to appellant was "in Captain Martin's handwriting." He admitted that the prospectus was prepared in Marsh's office, and that its actual writing was done by an "advertising man." He claimed that the sale by Heath to appellant was really a "hangover sale on Marsh's contract", but admitted that Heath presented to him appellant's check for $1,500. He explained his connection therewith in this language: "Heath had no bank account and couldn't cash the check; he wanted money at the time and asked me to arrange to get the thing cashed. I took the check to the Corn Exchange Bank. Whether I cashed it, or gave him the money, or whether I gave him the money from time to time, I don't know." He stated that Heath had no contract with him when selling the stock to appellant; that Heath worked for himself. He admitted that he saw the prospectus in the spring of 1923; knew it was being used in the sale of the stock of the corporation, although he disclaimed any knowledge of, or connection with, appellant.

Without a further detail of the evidence, this presentment of it will suffice for a proper consideration and determination of the issues presented.

Fraud is not to be presumed. The presumption of innocence, fair dealing, and good faith attends all lawful transactions among men. One who charges fraud, be

he plaintiff or defendant, assumes the burden of sustaining his accusation by such legal evidence as will overcome the legal presumption of innocence and beget a belief of the charge of fraud. Com. v. Filhatreau et al., 161 Ky. 434, 170 S. W. 1182; Marksbury v. Taylor, 73 Ky. (10 Bush) 519; Ind. National Life Ins. Co. v. Maines, 191 Ky. 309, 230 S. W. 54. It was the duty of appellant under this rule to make out his case. To recover on his theory of the case, he was required to establish by at least a scintilla of evidence (a) that the appellee, or his agent, made a material representation; (b) that it was false; (c) that when he made it he knew it was false, or made it recklessly without any knowledge of its truth as a positive assertion; (d) that he made it with intention to induce appellant to act, or that it should be acted upon by him; (e) that he acted in reliance upon it; and (f) that he thereby sustained an injury. Crescent Grocery Co. v. Vick, 194 Ky. 727, 240 S. W. 388.

It is abundantly shown by both the testimony of the officers and by the prospectus that the organization of the corporation was primarily for the "utilization of certain Stevens patents for cracking gasoline" for commercial purposes. The exploitation of the purpose of the corporation by the prospectus presented its success as an accomplished fact. Such false presentation by it of the business of the corporation constituted actual fraud, where the person making it knew, or ought to have known, of its falsity, and the complaining party relied and acted upon it to his hurt. 12 R. C. L. sec. 119; Pieratt v. Young, 49 S. W. 964, 20 Ky. Law Rep. 1815; Trimble v. Reid, 97 Ky. 716, 31 S. W. 861, 17 Ky. Law Rep. 494; Bystrom v. Villard, 175 App. Div. 433, 162 N. Y. S. 100; Church v. Wickwire, 231, App. Div. 249, 247 N. Y. S. 100; Aaron's Reefs v. Twiss, A. C. (1896) 273, 285; Downey v. Finucane, 205 N. Y. 251. 98 N. E. 391, 394, 40 L. R. A. (N. S.) 307. The so causing a false impression constitutes a palpable fraud, even though the statement is true as far as it goes, since such concealment is in fact a false representation of that which is disclosed, as the whole truth. 26 C. J. 1074, 1075; Coles v. Kennedy, 81 Iowa 360, 46 N. W. 1088, 25 Am. St. Rep. 503; Downey v. Finucane, supra; Van Houten v. Morse, 162 Mass. 414, 38 N. E. 705, 26 L. R. A. 430, 44 Am. St. Rep. 373. A duty to speak may arise from partial disclosure; the speaker being under the duty of saying nothing, or to tell the whole truth. Adkins v. Stewart, 159 Ky. 218, 166 S. W. 984; Hays v. Meyers, 139 Ky. 440,

738

107 S. W. 287, 32 Ky. Law Rep. 832, 17 L. R. A. (N. S.) 284, 139 Am. St. Rep. 493.

It cannot be successfully claimed, in the light of the testimony of the officials of the corporation, and even of the testimony of the appellee, that the prospectus spoke the truth, or even a half-truth. It is abundantly shown that the most that the corporation was doing under the Stevens patents was laboratory work at Newark, and that no production thereunder had been manufactured for commercial purposes in Louisville, Newark, or elsewhere. The corporation had installed a plant in the city of Louisville of 1,000 barrels' capacity, at which it was manufacturing a fuel oil known as "trioxoline," but it was not attempting to produce at this plant any gasoline under the Stevens patent. At Newark it was manufacturing neither "trioxoline" nor gasoline by the Stevens patents. At Newark there was merely a "testing laboratory." No contract had been entered into formally or at all by the corporation and the General Petroleum Company. One had been formally signed by it and the Inter-Ocean Oil Company for testing purposes only.

It is plain that the edifice of business of the corporation—in its dimensions, foundation, and superstructure—as it really was at the time, August, 1923, was wholly unlike that one which is so graphically exploited by the prospectus. Its inviting and lucid description of the one it portrayed inevitably impressed the mind of the prospective purchasers of the stock that the plants of the corporation had been standardized and the Stevens patents had been developed by the corporation, to the point of commercial success. It speaks deceitfully and falsely of a condition and status of the corporation as then standardized and operated for the manufacture of cracked gasoline by the Stevens patents for commercial purposes. So it appears to the ordinary mind when the actual facts touching the business and condition of the corporation are made known to it. The prospectus should be interpreted by the effect it has on the ordinary mind. Wiser v. Lawler, 189 U. S. 266, 23 S. Ct. 624, 47 L. Ed. 802; Downey v. Finucane, supra; Hayward v. Leeson, 176 Mass. 310, 57 N. E. 656, 49 L. R. A. 725.

To present the corporation by the prospectus without fairly disclosing the facts as to its equipment, the amount invested in improvements and plants, and as to its being engaged only in making laboratory tests, was

a fraud upon prospective purchasers by suppression of the facts.

A false impression may consist in a concealment of what is true as well as an assertion of what is false. Faris v. Lewis, 2 B. Mon. 375; Singleton's Adm'r v. Kennedy & Co., 9 B. Mon. 222; Crescent Grocery Co. v. Vick, supra; Weikel v. Sterns, 142 Ky. 513, 134 S. W. 908, 34 L. R. A. (N. S.) 1035; Eversole v. Chandler, 217 Ky. 148, 289 S. W. 215. The suppression of truth is as vicious and disasterous as a false representation. The motive is the same in either case, and the result should be the same, since it is the intention that constitutes the fraud. Ruffner v. Ridley, 81 Ky. 165; Hays v. Meyers, 139 Ky. 444, 107 S. W. 287, 32 Ky. Law Rep. 832, 17 L. R. A. (N. S.) 284, 139 Am. St. Rep. 493; Taylor v. Bradshaw, 6 T. B. Mon. 145, 17 Am. Dec. 132.

Speaking of an equivocal prospectus which was condemned as fraudulent in Aaron's Reefs v. Twiss, supra, Lord Halsbury called its language "ambidextrous," and this very aptly characterizes the one in the present case.

It is stated in that case that the fraudulent intent of the author and the user of a prospectus may be inferred from its own statements, and that the question whether taking the whole thing together was there a false representation; and all of its statements whether by trick or device or ambiguous equivocal language, may be considered as expedients by which fraudulent people think they can escape from the real transaction. It was further stated by Lord Halsbury that "if by a number of statements you intentionally give a false impression, and induce a person to act upon it, it is not the less false, although if one takes each statement by itself, there may be difficulty in showing any specific statement untrue." These principles were applied and followed by the court in Downey v. Finucane, supra, and Bystrom v. Villard, supra.

Certain contracts are listed in the prospectus as having been entered into by, or were awaiting the signatures of, the Chemical Fuel Company of America and certain named outstanding corporations in different sections of the United States, but no information is imparted by the prospectus as to the conditions therein, or as to the progress that had been made by virtue of contracts. It was held in Aaron's Reefs v. Twiss, supra, that a prospectus which merely specified the names of the parties to the contracts, but omitted to give notice

of circumstances and conditions contained in such contracts, which are material to be known, and the omission of which causes the prospectus to give a false impression, such constitutes a fraud sufficient to sustain a recovery on the ground of fraud. This rule was approved and followed in Downey v. Finucane, supra, and in Churchill v. St. George Development Co., 174 App. Div. 1, 160 N. Y. S. 357; Lambert v. Elmendorf, 124 App. Div. 758, 109 N. Y. S. 574; Chatham Furniture Company v. Moffatt, 147 Mass. 403, 18 N. E. 168, 9 Am. St. Rep. 727.

The appellee insists that the evidence is not contradicted, showing he had not met and did not know the appellant at or prior to the time the stock was sold to him by Heath, and that he (appellee) had no connection, direct or indirect, or communication, with the appellant relative to his purchase of the stock.

This insistence overlooks and fails to evaluate other important material evidence. The deposition of appellant was taken as upon cross-examination, wherein he testified that "Heath was not working for himself." "He had a contract with me." In addition to this, when on the witness stand at the trial, he testified in this language: "Well, now when we would sell a share of stock, Marsh would send the money back to Martin, and Martin would send the stock of course." These statements not only corroborate Heath, but when considered in connection with his testimony, they preclude appellee's right to a peremptory on such ground.

Another view of the evidence bearing on his right to a peremptory instruction requires our consideration. Although appellee resigned as secretary and director in June previous to appellant's purchase of the stock in August, 1923; he furnished his and the other officers' and directors' names, the data, and other information which was used in the prospectus, and knowingly permitted it to be used to sell the stock of the corporation. Therefore he occupies the same relationship to the appellant in the transaction, and his liability to him is the same, as if he were in fact secretary and director of the corporation, even though Heath was not employed by him. James v. Stokes, 203 Ky. 127, 261 S. W. 868; Ligon v. Minton (Ky.), 125 S. W. 304; Farmer v. Gipson, 201 Ky. 477, 257 S. W. 1; Waller v. Logan's Heirs, Etc., 5 B. Mon. 515. Heath, at the time of the sale of the stock to appellant, used the prospectus which carried appellee as the secretary and as a director of the corporation, to effectuate the sales; received and accounted for their pro-

ceeds. The liability of appellee for damages resulting therefrom is therefore the same as if he were an officer in fact of the corporation, if the other representations of the prospectus were false or deceitful and were relied upon by appellant. 12 R. C. L. 730; Thompson on Corporations, vol. 12, p. 890; James v. Stokes, supra.

The statement in the prospectus that he was at the time of the sale of the stock to appellant a director and secretary of the corporation was itself deceitful, false and untrue. He cannot now avail himself of his own false and fraudulent statement in this respect to save himself from liability to appellant by virtue of other and additional deceitful or false statements contained in it. A mere reading of the prospectus convinces the mind that the signatures of the officers and members of the board of directors therein were so used as to make it appear they had authorized and approved of it and its contents, and that this was so done with the intent to impress the prospective purchasers that by and with their authority, information was conveyed thereby that the corporation was flourishing successfully in its production of cracked gasoline by the Stevens patents. He stands by reason thereof in the shoes of a duly qualified and elected director and secretary of the corporation.

In the case of James v. Stokes, 203 Ky. 133, 261 S. W. 868, 871, we said:

". . . One is liable because of the legal effect of his relationship as created by his actions, words, and conduct from which no denial or protestation howsoever solemn or profane on his part may rescue him."

And in Downey v. Finucane, supra, quoting from Hayward v. Leeson, 176 Mass. 310, 57 N. E. 656, 49 L. R. A. 725, the court said:

"It was held that the promoters of a corporation were guilty of a fraud in issuing a prospectus to the public inviting subscriptions to the stock without disclosing the fact that they had caused it to be issued to themselves. . . ." See, also, Wiser v. Lawler, 189 U. S. 260, 23 S. Ct. 624, 57 L. Ed. 802.

The corporation received $400 as its part of the proceeds of the sale to appellant. The appellee's stock in the corporation received the benefit of the $400. Appellee's testimony is sufficient to make him a particeps

criminis to the creating, the issuing and using of the prospectus. Com. v. Ellis, 133 Ky. 625, 118 S. W. 973. The composing, publishing and issuing of the prospectus, if its statements were substantially true, were lawful acts. If it was deceitful or false, and known so to be by the appellee and Marsh, and was intended to be and was used by them and Heath with intent to defraud the prospective purchasers, then its purpose and use were unlawful.

Their intent is proven by their acts. U. S. v. Baldridge (C. C.) 11 F. 552. If he and Marsh and Heath entered into the transaction in pursuance of an arrangement among themselves for a fraudulent purpose, and in the execution thereof Heath sold the stock to appellant, then the appellee by virtue thereof is liable to appellant for the resulting damage, even if Heath was not representing him at the time under any other contract or arrangement.

The elements of false pretense are: (a) the false pretense must be made by the defendant, or by some one whom he had induced to make it; (b) the defendant must have knowledge of the falsity of the pretense, statement, or token when he made it; (c) the person defrauded must have relied upon the pretense and have been induced thereby to part with his money; (d) the money must have been obtained by defendant or some one in his behalf; (e) the defendant must have had an intent to defraud; (f) actual defrauding must have resulted. Rand v. Com., 176 Ky. 343, 195 S. W. 802.

The actions and conduct of Marsh, Heath, and the appellee coupled with the contents of the prospectus, according to his own testimony, strongly tend to establish a confederation or conspiracy to defraud prospective purchasers of the stock, including the appellant, and that the prospectus was prepared and used for that purpose, and in execution of such conspiracy, while the same existed. A party to a conspiracy is liable for damages resulting therefrom. Metcalfe v. Commer, Littell's Sel. Cas. 497, 12 Am. Dec. 340; Leech v. F. T. W. Co., 171 Ky. 791, 188 S. W. 886.

Objections were made and exceptions saved to the ruling of the court on the admission and rejection of evidence, and especially to the rejection of the testimony of an officer of the bank in which the proceeds of appellant's $1,500 check were deposited by appellee. The bank records and the testimony of the officer in respect thereto

tend to corroborate witness Heath and as well to contradict the evidence of appellee. It should have been admitted.

Appellant was asked if he relied upon the statements of Heath and of the prospectus, and if he was induced thereby to purchase the stock. At the time this question was asked, the deposition of Heath who since its taking had died, had not been read as evidence. Under these circumstances it was proper to sustain the objection at that time. But after his deposition was read it was competent for him to say whether he relied upon and was induced by the statements of the prospectus to purchase the stock, Heath having testified that he conveyed the same to appellant for that purpose. The act of the mind of appellant in relying upon the statement of the prospectus was in no sense a transaction with one deceased within the meaning of section 606, Civ. Code of Practice.

It appears that a portion of the record of the proceedings of the board of directors of the corporation relating to appellee and his connection therewith had been cut out of the book in which it was kept. So much of it as was in existence was competent. If it cannot be found, its contents may be proven by any witness who was present at the meeting of the board of directors, and who may know what transpired at that particular meeting.

It is apparent that it is our opinion that the court erred in giving the peremptory instruction. For this reason the judgment is reversed for a new trial consistent with this opinion.