## James v. Stokes, et al.

(Decided May 9, 1924.)

### Appeal from Fayette Circuit Court.

1. Contracts—One is Bound by Legal Effect of Conduct.—One is liable because of legal effect of his relationship as created by his actions, words, and conduct, from which no denial or protestation, however solemn or profane, on his part may rescue him.

2. Bills and Notes—Prima Facie Presumption that Words "as Syndicate Manager" were Descriptio Personae.—The words "as syndicate manager," following name indorsed on note, held descriptio personae, and there was prima facie presumption of personal liability assumed by signer.

3. Evidence—Pleading Fraud or Mistake Necessary to Admit Introduction of Parol Evidence.—A pleading of fraud or mistake is necessary to admit introduction of parol evidence to show that absolute obligation assumed by indorsement on note is different from what it purports to be on its face.

4 Bills and Notes—Indorsement and Words "Accepted and Payable" Import Absolute Promise to Pay.—Indorsement on note containing words "accepted and payable" import an absolute promise to pay.

5. Corporations—Member of Syndicate Liable for its Debts.—A member of a syndicate is liable for its debts.

6. Bills and Notes—Accommodation Indorser Liable, if Legal Requisite Steps Taken.—An accommodation indorser is liable for amount of note, if legal requisite steps are taking by holder.

7. Bills and Notes—Evidence Held Not to Establish Condition Affecting Otherwise Absolute Promise of Payment.—In an action to hold indorser on note, evidence held not to establish any condition affecting otherwise absolute promise of payment.

8. Evidence—Former Communications do Not Affect Subsequently Incurred Liability as Indorser.—Formal letters, telegrams, or other communications from indorser on note denying individual or personal liability cannot affect subsequently incurred liability growing out of indorsement.

9. Bills and Notes—Telegram Held to Confirm Indorsement of Syndicate.—A telegram, "Arrangement is E. assigned to me as syndicate manager stock to·sell and settle E. cash and stock obligations to his oil lease holders. That is all"—held confirmation that indorsement by sender "as syndicate manager" on note was that of syndicate, of which he was member.

10. Estoppel—Officers—Indorser of Note Held Estopped to Deny Liability as Member of Syndicate where Payee Relied Thereon.— One indorsing note "as syndicate manager" was estopped to deny that syndicate of which he was member was bound, where payee informed all members of syndicate that such was his interpretation of the indorsement and indorser waited more than twenty days before denying liability of syndicate or himself, during which time payee was lulled into repose and changed his attitude.

11. Fraudulent Conveyances—Conveyances to Corporation Owned by Grantor Held Fraudulent.—A conveyance of all land in state to a corporation owned by grantor, which gave notes that were used in borrowing money to pay debts of corporation in another state owned by the grantor, held fraudulent under Ky. Stats., sections 1906, 1907.

12. Fraudulent Conveyances—What Constitutes Badges of Fraud— Burden to Show Bona Fides on Grantor.—Deceiving recitation as to consideration, apparent inability of grantee corporation to buy property, failure to record deed until long while after execution, and inadequacy of actual consideration, are each badges of fraud, and cast burden on grantor to show bona fides of transaction under Ky. Stats., sections 1906, 1907. ·

13. Fraudulent Conveyances—Conveyance in Anticipation of Suit Prima Facie Fraudulent.—Conveyance in anticipation of suit is prima facie fraudulent.

14. Fraudulent Conveyances—When Fraudulent Intent is Material.— If conveyance is voluntary, a fraudulent intent is not required · under Ky. Stats., section 1907, to entitle to relief against either grantor or grantee, while under section 1906 an intent to defraud on part of grantor is necessary, but conveyance may not be attacked as against grantee for valuable consideration without knowledge of fraudulent intent.

15. Corporations—Knowledge of Grantor, Owner of Corporation, Held Knowledge of Corporation.—Fraudulent intent on part of grantor was necessarily known by grantee corporation, where grantor was sole owner thereof, under Ky. Stats., section 1906.

16. Fraudulent Conveyances—Taking of Notes Mere Change in Evidence of Debt Not Affecting Prior Conveyances.—Mere taking of notes for past ·obligation was only change in evidence of debt, and did not affect right of payee to set aside prior conveyances as fraudulent, under Ky. Stats., sections 1906, 1907.

17. Fraudulent Conveyances—Subsequent Creditors May Set Aside Actual Fraudulent Conveyances.—Under Ky. Stats., section 1906, subsequent creditors are entitled to have actually fraudulent con-

veyances set aside, though there was valuable consideration paid by grantee having actual knowledge of fraud.

18. Fraudulent Conveyances—Effect of Ownership of Property in Other Jurisdictions.—A creditor is entitled to have conveyance in fraud of creditors set aside, though grantor is solvent in that he has property in other states, under Ky. Stats., sections 1906, 1907.

HOBSON & HOBSON, E. C. O'REAR, J. P. HOBSON, H. L. JAMES and BAILEY D. BERRY for appellant.

MAURY KEMPER, H E. ROSS, MILLER & MILLER and HUNT, NORTHCUTT & BUSH for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

By this equity action filed in the Fayette circuit court by appellant and plaintiff, H. L. James, against appellees and defendants, W. E. D. Stokes and the Mervyn Realty Company, a corporation, plaintiff seeks to hold defendant, Stokes, liable on an endorsement made by him on a note for $2,500.00 and on a number of others for $6,570.00 each, all dated January 5, 1918, and signed by William C. Eakins and each of them payable "at Room 936, No. 149 Broadway, New York city," upon successive dates. The petition also seeks to subject to the payment of the notes a tract of land in Fayette county containing in excess of 379 acres, the title to which was nominally held by the corporate defendant through a deed executed to it by Stokes on December 28, 1917, but which, plaintiff avers in his petition, was fraudulent and was made and executed for the purpose of defrauding the creditors of Stokes, and particularly plaintiff, and was without consideration and with the intent to hinder and delay creditors of Stokes in the collection of their debts. The endorsement of Stokes on each note is "Accepted and payable at Room 936, No. 149 Broadway, New York city, by W. E. D. Stokes (in his writing) as syndicate manager." Stokes was proceeded against by constructive service and he filed no answer in the case nor otherwise entered his appearance, but his co-defendant answered and denied the fraudulent conveyance to it of the property sought to be subjected to the debt sued on, and in another paragraph pleaded in substance that Stokes, by the quoted endorsement of the notes, did not intend to nor did he in fact incur any absolute personal liability, but that he thereby incurred only a conditional one dependent upon his selling certain stock of the Kenturky Producers' & Refiners' Corporation, which had been placed in his

hands by the maker of the notes, Eakins, as "syndicate manager" for the purpose of sale and with the proceeds to discharge them; and in effect the answer contended, as is also done by counsel on this appeal, that the endorsement contract was that unless Stokes, as syndicate manager, succeeded in selling sufficient stock to pay the notes he was released from all further liability. Appropriate pleadings made the issues and a large volume of testimony was taken, including answers made by the corporate defendant to attached interrogatories filed with the petition, and upon final submission the court dismissed the petition, from which judgment plaintiff prosecutes this appeal.

To undertake to treat in this opinion each legal question, direct and collateral, made by the respective parties in this case, or to notice the vast array of cited authorities and point out their applicability or inapplicability to the principles of law involved or argued, would extend this opinion far beyond the correct bounds, as well as render a large portion of it unalloyed dictum. The notes sued on were executed in payment for the transfer of a long list of oil and gas leases owned by plaintiff upon about 125,000 acres of land located in a number of counties in this Commonwealth, and which he transferred and assigned pursuant to telegraphic direction from Stokes on October 10, 1917; but the preceding negotiations and contracts leading up to that transfer were largely conducted by Eakins, who represented that he was a member of a syndicate composed of himself, Stokes and one Crawford and perhaps one or two others, but which representations, it is perhaps properly insisted, are not competent as against Stokes without further proof of the actual existence of the syndicate. However, we are convinced from the oral testimony given in the case, plus that furnished by various exhibits in the form of letters and telegrams, including some from Stokes, himself, that there exists no doubt but that Stokes was a member of a body of individuals, including Eakins and Crawford, who had agreed among themselves to procure oil and gas leases in this Commonwealth, and perhaps elsewhere, for the purpose of organizing the Kentucky Producers and Refiners Corporation to operate the lease sso obtained, and to which company they would be assigned and transferred upon its organization, which was done about the 16th of September, 1917, with a capital stock of $10,000,-

000.00, at the back of which and to support the value of which, according to the record, the corporation obtained practically nothing but the leases and wind.

Stokes was at Lexington, Kentucky, at the meeting in August, 1917, which culminated in the first contract for the sale of about 100,000 acres of the leases by plaintiff to be used in the manner and for the purpose indicated and which contract was signed by only James and Eakins, though Stokes was present during the initial negotiations but had left Lexington, perhaps, before it had been agreed upon, or before it was executed. After that James obtained other leases and entered into a second contract at which time he extended the due dates of the deferred payments for the sale of the first ones, and the second contract was made at a meeting in New York, at which Stokes, Crawford, Eakins and other participants in the organization of the proposed corporation were present, plaintiff having been called there by Stokes, who entertained him at his palatial quarters for something like ten days. Had we time and space to insert some of the correspondence appearing in the record, it would most convincingly appear that Stokes was devoting a large part of his time in obtaining the leases as a preliminary step to organizing the corporation and that he consented for the contracts to be made in the name of Eakins, but it is so patent and evident that he was so interested therein as to not require detailed discussion. It is true that he declined at the New York meeting to guarantee the payment of the consideration for the contracts made by Eakins for the assignment of the leases, upon the ground that he never executed notes, but according to the testimony of James he did orally promise to see that the leases were paid for, and later at that meeting executed a note jointly with Eakins and others for the first payment and he was quite active at that time and later in having the due dates for the deferred payments extended for various reasons, among which was that the surplus money of the country was then being invested in Liberty Bonds and cash could not be readily obtained with which to make the payments. He was also solicitous to have the leases assigned and transferred according to the terms of the two contracts and, as said, he himself telegraphed James to make the transfer upon the ground that it was necessary to enable the then formed corporation to dispose of its stock. To that telegram James responded that he had made the transfers and delivered the leases to

some attorneys in Lexington as directed in the telegram of Stokes, but that he did so with the understanding that he, Stokes, would see to it that the consideration was paid. We think enough has already been stated to make it clearly appear that Stokes was one of the promoters of the corporation and expected to receive large profits from its organization, although he was putting forward Eakins, whom he acknowledges was a comparative stranger to him, as the active agent in procuring the leases, but Crawford and other promoters, by letters, telegrams and meetings, also assisted in the negotiations.

The deferred payments were not made on the days specified and James was quite active in his efforts to collect them and wrote letters to Eakins, Stokes, and other promoters concerning the matter and suggested the execution of notes, which brought forth a letter from Stokes (November 13, 1917), in which he, for the first time, denied that he was in any wise interested in the leases or their future handling, and he subsequently declared that all of his activities had been performed in an effort to accommodate his friend, Eakins, and to assist him put over the deal, although at that time there had been set apart to the promoters as a syndicate $5,000,-000.00 of the capital stock of the already organized corporation in payment of the leases which the promoters themselves had not paid for and for which, under the terms of the transfer, the corporation itself was not liable, and which condition was brought about at the direction of Stokes, himself, when he directed plaintiff to transfer the leases so as not to create a claim against the corporation and thereby refute a statement made in a published glowing prospectus to the effect that it owed no debts.

Stokes was to have between one and two million dollars of the five million dollars of stock delivered to the promoters, and at the same time, or about then, there was set apart $900,000.00 of that stock to be sold by Stokes for the purpose of realizing money to pay the indebtedness incurred for the leases from James and from others which had been transferred in like manner. The promoters who were to be benefited by the payment of those debts styled themselves a syndicate with Stokes as its manager. As to the organization and actual existence of that particular syndicate there can be not the slightest doubt, for in 1919 Stokes delivered all or a part of the stock, which he was to sell as trustee or "syndicate man-

ager'' and pay the debts, to a Philadelphia trust company under a contract dealing with many subjects not pertinent to this case, but in it it was recited and stipulated that the syndicate was composed of Stokes, Eakins and Crawford and it was signed by Stokes. It was furthermore recited in that contract that the syndicate stock held by Stokes for the purpose above indicated should be sold by the trust company and with the proceeds the *debts of the syndicate* to plaintiff and others were to be paid and the balance divided among the members of the syndicate who had, as above stated, already obtained as a bonus a large amount of the stock of the corporation in consideration of the leases. So that, in view of the foregoing and other facts in the record, we consider it folly to pursue the matter further upon the question as to whether Stokes was a member of the syndicate, or if there were two syndicates (one in the nature of promoters of the corporation and the other for the purpose of selling stock and paying the debts) that he was a member of both, because what we have already stated, and what will hereinafter appear, is more than sufficient to establish his membership in only the one, if that was all, or in both, if there were two. Therefore, his express refusal in his November 13th letter to guarantee or secure plaintiff's debt, and his denial of liability therefor because he was not a nominal party cannot avail him as a defense to his legal liability growing out of his membership of the syndicate, since one is liable because of the legal effect of his relationship as created by his actions, words and conduct from which no denial or protestation howsoever solemn or profane on his part may rescue him, for, as stated in Commonwealth v. Southern Railway Co., 193 Ky. 474, ''This is a practical age in which we live and facts are regarded more than fiction, and courts recognize things as they are and not as they appear when clothed in a disguised garb.'' But passing that phase of the case we next come to a consideration of the legal effect of the endorsement made by Stokes on each of the notes.

Before, however, addressing ourselves to that question, it, perhaps, should be stated that James was threatening suit, which Stokes knew, and he received a telegram from Eakins to meet Crawford for the purpose of arranging the matter. Crawford and Eakins operated from the same office as did Stokes, which was the office of the corporation in New York, and each of them had rooms

and desks therein. The request from Eakins for that meeting was superinduced by a threat from James to sue the promoters, including Stokes, unless he received notes for his debt upon which the promoters were obligated; and those communications resulted in Crawford meeting James in Cincinnati, Ohio, and pursuant to a later arrangement the same parties again met in Louisville, Ky., about January 11, 1918, and Crawford on the latter date brought with him notes covering the indebtedness, but dated Janury 5, 1918, from which date they were to bear interest under James' proposition. Those notes were signed by Eakins only and were endorsed "Accepted and payable at Room 936, No. 149 Broadway, New York city, by W. E. D. Stokes, as syndicate manager *and without personal liability.*" (Our italics.) James thereupon declined to accept them and so informed Crawford and at the latter's request put his refusal as well as his demands in writing, in which he said, "I can accept no settlement that would have the effect of relieving you and Mr. W. E. D. Stokes from my claim that you are personally liable on these contracts," and submitted therein an altered proposition relating to the amounts of each note as well as postponing their due dates. At the same time Crawford sent a telegram to Stokes in New York saying in part, "James will not accept notes without your and my endorsement;" and stated therein the substance of James' altered proposition. Crawford returned carrying with him the notes and James' letter and on January 24, 1918, plaintiff received a letter from G. B. Harmon enclosing the notes sued on with the present endorsement thereon. On the same day he received a letter from Eakins to Harmon relative thereto and also one from Stokes, each of which letters bore the same date of January 22, 1918. Upon the head of the letter of Stokes and above its date there was this writing in capital letters: "IT IS WITH THE DISTINCT UNDERSTANDING THAT THESE NOTES LIQUIDATE ALL WM. C. EAKINS' INDEBTEDNESS TO YOU OR YOUR ASSOCIATES ON THE LAND THAT IS NOW OWNED BY THE KENTUCKY PRODUCERS' & REFINERS' CORPORATION." The letter began with this statement: "I have received back the notes I endorsed as syndicate manager, only, and without personal liability, with the understanding that you have arranged to accept these same notes endorsed 'Accepted and payable at room 936 Singer Building, 149 Broadway, by W. E. D. Stokes, as syndicate manager,' and that you have written to this

effect to Mr. Geo. B. Harmon," which latter statement is not proven by any one. He then stated therein, in substance, that from the prospects of the sale of stock he had every assurance that as syndicate manager he would realize enough proceeds belonging to the syndicate with which to pay the notes promptly when they became due.

Although James, as he testified and which was true, was of the opinion that the words "as syndicate manager," following the name of Stokes as endorser of the notes, were but *descriptio personae,* yet to remove cause for contention he telegraphed Stokes on January 24, 1918, the day he received the letters and the notes, saying: "Do you intend that your endorsements on the Eakins notes to me are to bind the members of the syndicate? Also give me names of members composing syndicate you refer to. Answer at once by wire." Receiving no answer therefrom and about two hours thereafter he sent Stokes this telegram: "Am accepting notes sent me with the understanding that endorsements which you have made is intended to bind as endorsers the members of unincorporated syndicate of which you are a member and the manager. If this was not the purpose of the endorsement, wire me and I will return notes." On the next morning he received a message from Stokes saying: "Arrangement is Eakins assigned to me as syndicate manager stock to sell and settle Eakins' cash and stock obligations to his oil lease holders. That is all." That telegram was received on January 25th and on the next day James addressed a long letter jointly to Stokes, Eakins, Crawford and George B. Gifford, another one of the promoters and who was also active in forming the corporation. The letter was addressed to each of the parties at New York except Crawford's address was at Charleston, W. Va. In that letter James recited the fact of his receiving the notes with Stokes' endorsement thereon and the letters of Stokes, Eakins and Harmon on the 22nd of January, as well as his last two telegrams to Stokes and informed the parties that he interpreted the endorsement of Stokes as binding on all the members of the syndicate. He further stated therein that he desired no misunderstanding with reference to the matter, and also said that, "I will not accept the notes unless it was the intention of Mr. Stokes, by his endorsement, to bind the syndicate members for the payment therefor. . . . Now, if I am correct with reference to my construction of Mr. Stokes' endorsement, and if the inten-

tion of Mr. Stokes, as manager of the syndicate, was as outlined, and the same is satisfactory with you gentlemen, and I will assume it is unless I hear to the contrary, you may have issued of the stock provided for in the two contracts'' (which was the stock agreed to be issued to him in addition to the money consideration he was to be paid for the leases), and he closed the letter with the statement, "Of course this direction is based upon the assumption that my interpretation of the endorsement made on the notes as set forth herein is correct as to the intention of Mr. Stokes' endorsement, and that it is satisfactory to the members of the syndicate.'' That letter was registered to each of the addressees and was directed to the well known offices of each of them. Returned registry cards were received from all of them except Stokes, whose letter was returned to James unopened, and endorsed "Refused. Return receipt requested.'' The others answered and acknowledged the receipt of the letter and stated therein that James' interpretation of the Stokes' endorsement was correct. Stokes claimed not to have seen that letter, since he declined to receive the copy addressed to him, but we think there is enough in the record to conclusively show that he did see the copy addressed to either Gifford or Eakins, or perhaps both, since, as we have seen, they had desks in the office of the corporation in which he also had one, where they were each exceedingly busy at that time, as they had been from the beginning, to effectuate the arrangements so that the corporation which they had organized could be utilized to grind out the large profits anticipated and contemplated; and there is no doubt but that he declined and refused to accept the letter addressed to him because of his previously acquired knowledge of its contents. Indeed the record is barren of any other reason for his so doing. He had received all other communications from James prior to that time, but this one, of whose contents we are assured he was aware, required from him a positive and definite response, either that he was personally obligated on the notes by virtue of his endorsements either individually or as a member of the syndicate, or if not to say so and thereby suffer other delays and misunderstandings and the future prospects of the corporation to become imperiled, or be sued by James as he had previously threatened. To sign the registry receipt would be conclusive evidence that he received the letter, and to extricate himself from the impending dilemma, he probably

concluded to not receive the letter and to thereafter be in
a position to contend that he was unaware of its contents.
The ruse and its purpose, in the light of the facts appear-
ing in the record are glaringly apparent. Fair dealing
required of him to receive and frankly answer that letter,
and the same was true of his above copied telegram to
James on January 24, 1918, when the latter had inquired
as to his purpose in endorsing the notes and for the
names of the members of the syndicate. Instead of do-
ing so he sent his cryptic telegram and later declined to
receive the letter, and James heard nothing from him
until some time in the latter part of February, when he
wrote letters to the other members of the syndicate and
one to plaintiff, some of which were couched in profane
language, and in them he denied personal liability; but
in the meantime James, not having heard from him, and
being informed by the other members of the syndicate
that he was correct in the interpretation of the endorse-
ments, accepted the notes and settled with Gooch, a part-
ner in some of the leases, and discounted one or more of
them to a bank, thereby changing his attitude and plac-
ing himself in such a position as that he could not recede
from his acceptance of them. Our task, therefore, is to
determine the legal rights of the parties from the above
condensed though lengthy statement of the determina-
tive facts.

The first question to be considered is the effect of
the endorsement standing alone. It is the contention of
learned counsel for appellees that the endorsements *ex
vi termini* are insufficient to impose individual liability
on Stokes, since, as contended, they show on their face
that they were made by him in some representative capa-
city, but we are not prepared to accept that as a correct
statement of the law upon the subject. The words, ''as
syndicate manager,'' are evidently, and indeed conceded
to be, *descriptio personae,* and the law is that even as
between original parties they do not destroy the personal
obligation of the person to whose name they are attached,
although the writing may show that the signer acted for
some undisclosed principal. In the latter case there is
a *prima facie* presumption of personal liability assumed
by the signer. Newman's Pleading and Practice, third
edition, section 170B; Pack v. White, 78 Ky. 243; Mc-
Kenzie v. Edwards, 88 Ky. 272; Moffett v. Hampton, 17
Ky. L. R. 534; Cappart v. Dodd, 3 Bush 584; Warford

v. Temple, 24 Ky. L. R. 2268; Riordan v. Thornsbury, 178 Ky. 324, and 3 R. C. L. 1095.

Whether the *prima facie* liability so assumed may be defeated and another shown to be the true obligor through the introduction of parol testimony as to the intention and purpose of the parties in executing the instrument, without an allegation of fraud or mistake in the pleading of the person offering it, is a question that, so far as the purposes of this case are concerned, is not necessary to determine, though the cases referred to seem to hold that even in that case such an allegation is required. If, however, we should hold that such allegation was not necessary to let in parol proof in order to show whose obligation the instrument was, *i. e.*, whether it was that of either a disclosed or an undisclosed principal, or one assumed by the individual signer, we are convinced that such a pleading *is* necessary to admit the introduction of parol evidence to show that the absolute obligation, by whomsoever assumed, is different from what it purports to be on its face. The authorities all agree, with none to the contrary, that before such testimony may be admitted to affect the terms of the instrument on its face, or to alter the obligation, a pleading of fraud or mistake is necessary, as will appear from the cases and authorities *supra,* to which may be added the two late cases from this court of Tross v. Bills, 189 Ky. 115, and Simons v. Douglas, idem 664; and see also 3 R. C. L. 868. Other cases, as well as text book authorities, could be cited without limit supporting that rule of practice. There was no such allegation in any defensive pleading in this case and whatever may be the rule with reference to identifying the true obligor by parol proof, without a plea of fraud or mistake, it is thoroughly established that without such a pleading parol proof is inadmissible to alter, change or in any wise effect the obligation of the writing as appears upon its face. The writing involved in this case is the endorsement signed by Stokes and the words "Accepted and payable" import an absolute promise to pay. Hoskins v. Black, 190 Ky. 98; 8 C. J. 116, par. 210. That principle of law, however, is not denied in this case, but only that the promise so made was a *conditional* one. But whether the promise is that of Stokes individually or of the syndicate of which he was a member can make no difference so far as the purposes or this case are concerned, since being a member of the syndicate he is, under a well known principle of the law,

liable for its debts, and whether the obligation incurred by the endorsements assumes the one form or the other, plaintiff has the right to proceed against him to collect the notes unless some valid and properly presented defense is available. In no event, therefore, would it be a defense to prove by parol testimony or otherwise that the endorsements were the obligations of the syndicate and not those of Stokes individually.

The endorsement was made on the notes for some purpose other than to transmit title thereto, since neither Stokes nor the syndicate appeared as payee therein or in any other manner connected therewith. It was an accommodation endorsement which in law obligates the endorser to pay the amount of the note if the legal requisite steps are taken by the holder. Those steps were taken in this case, and under the law as above announced it would seem that the only question to determine is the effect of the endorsement under the terms in which it is written which, as we have seen, is a promise to pay.

If, however, the parol proof offered in this case was admissible to show that the promise by the endorser was a conditional one without a plea of the omitted condition through fraud or mistake, we are then of the opinion that the evidence failed to establish any condition or conditions affecting the otherwise absolute promise of payment. The chief item of evidence relied on to sustain the defense was the telegram of Stokes to James, which it is claimed was sent on January 24, 1918, but received by the latter the next morning, in which James was informed of the arrangement by which Stokes was to procure funds with which to settle the notes. He did not say in that telegram that such an arrangement measured the extent of his liability but, as we interpret it, it only imparted the information to James that Stokes had received sufficient stock from the syndicate to satisfy him that the notes would be paid, and that it had been so arranged between him and Eakins, or the latter and other members of the syndicate, and so, James stated in a letter which he wrote subsequent thereto that he was not concerned as to the source from which Stokes obtained the money with which to pay the notes but only that they would be paid by him. We do not attach to the words in that telegram, ''That is all,'' any further significance than to inform James that the preceding part of the telegram was all of the arrangement between Stokes and Eakins, or the other members of the syndicate. It may

have been that it was also the intention of Stokes to inform James that what was contained in his telegram was all the information that he was willing to or would impart, which view is somewhat strengthened by the fact that he declined to say anything therein in response to James' inquiry as to who composed the syndicate. Clearly, Stokes meant as well as did James, Crawford and the others, for the endorsement sued on to accomplish more than the endorsement of the first notes containing the words "And without personal liability;" and it is equally clear that the purpose was to make the altered endorsements create personal liability instead of defeating it as the first one did, but the contention of the defense now is that the last one (the one sued on) meant no more than the first one that was rejected by James, which to our minds is wholly untenable in the light of the facts disclosed and hereinbefore recited.      Evidently, under a well known principle of law, any former letters, telegrams or other communications from Stokes denying individual or personal liability, as a member of the syndicate or otherwise, can not affect his subsequently incurred liability growing out of the endorsement, and unless his telegram referred to, of date January 24, 1918, can be given that effect there is no proof in the case to qualify the absolute liability incurred by them.      Our interpretation of that telegram, in the light of the facts and circumstances immediately preceding its sending, and immediately surrounding the execution of the notes, is, under the most favorable view for Stokes, that it confirmed the fact that the endorsement was that of the syndicate of which, as we have seen, Stokes was a member, and that he had been made paymaster for the syndicate, and that it had placed with him assets from which he and its members expected that sufficient funds would be realized to meet the notes as they became due and that such facts were all that he proposed to communicate to James.

If, however, we are mistaken in that interpretation of his telegram, we still think that under the facts disclosed he should be held liable on the notes as a member of the syndicate.      It will be remembered that plaintiff after as well as before receiving that telegram informed all the members of the syndicate that unless his (James') interpretation of the endorsement was true he would not accept the notes.      Under such circumstances it was the duty of Stokes to at once inform plaintiff in terms capable of at least ordinary understanding, of the true situa-

tion. Instead of so doing he waited some twenty days or more, during which time James, by his silence, was lulled into repose and acting on his own interpretation of the endorsements, changed his attitude, and we think it is a sound principle of law that under such circumstances the interpretation of James was acquiesced in and ratified by Stokes. So that in any view of the case, we think the court erred in holding that Stokes was not liable for the face value of the notes and interest. It is true that he testified that he wrote a letter to James at or about the time he sent the telegram of January 24, 1918, but the latter denied having received any such letter, even if we should accept the testimony of Stokes as competent, which is doubtful, since he gave it after his corporate co-defendant had taken in chief the depositions of other witnesses, and that fact would seem to render his testimony incompetent under the opinion in the case of American Wire-Nail Co. v. Bayless, 91 Ky. 94, and the Superior Court opinion in the case of Mt. Sterling Turnpike Co. v. Hamilton, 14 Ky. L. R. 720. But, whether so or not the reputation of Stokes for truth and veracity was impeached by a number of citizens of Lexington and Fayette county and there was no witness introduced who testified to sustain it. In view of those facts, we feel fully authorized in determining the case from the standpoint that either no such letter was written, or if so that James did not receive it.

The next question to be determined is the one concerning the right of plaintiff to subject the tract of land in Fayette county to the payment of the notes as the debt of Stokes upon the ground that it was fraudulently conveyed by him to the corporate defendant contrary to the provisions of section 1906 of the Kentucky Statutes or those of section 1907, the remedy for which, if true, is the one provided by section 1907a, which was invoked in this case. The facts concerning the execution of that deed are furnished mainly by the deposition of Gleason, the attorney of Stokes, and the one who, according to his testimony, suggested the transfer and prepared the deed which, as we have hereinbefore stated, was executed on December 28, 1917, before the notes in litigation were executed but after the leases were transferred by James as directed by Stokes, and after plaintiff had threatened suit against all the members of the syndicate unless he was paid for the leases, as per agreement. In other words he had prior to the execution of the deed informed

Stokes that unless the payments were made or secured by acceptable notes he would proceed in the proper forum to collect the total sum due him. If Stokes was a member of the promoting syndicate for whom Eakins, with his consent, was the negotiating actor (which was the true situation as we have hereinbefore found) the liability of Stokes for James' debt was an existing obligation at the time of the conveyance, and on the very day it was made James was in conference with Crawford in Louisville, Kentucky, the purpose of which was to effect some kind of arrangement satisfactory to James and by which the due dates of the different installments of the debt would be postponed. That conference culminated in the execution of the first set of notes that James declined to receive on account of the language of the endorsement by Stokes and which were later substituted by the notes in litigation. So much for the setting.

The Mervyn Realty Company is a corporation organized in 1911 with a nominal capital stock of only $10,000.00. For the purposes of its organization, Gleason, the attorney, subscribed for one share; Thomas Stokes, defendant's brother, one share; defendant three shares, and Leslie S. Petrie, defendant's secretary, ninety-five shares. We might indulge the presumption that the subscriptions were paid for, although we fail to find any proof in the record of that fact. Petrie and Gleason testified, and no one denied it, that no one beneficially subscribed for any of the stock, except defendant, and that immediately upon the issuing of the shares, after organization, as so subscribed for, all of the incorporators transferred their stock to Stokes and thereby made him the actual beneficial owner of all the stock of the corporation, although he neither made nor caused to be made any corporate record of that fact, nor did he issue new certificates to himself in lieu of the transferred ones, thereby keeping the actual facts hidden. Pursuant to the purpose of the organization of that company, the larger portion, if not all, of defendant's real estate in New York, to which he held title, and of the assessed value of more than $1,000,000.00, was conveyed to the corporation, but those deeds were not put upon record until after James threatened suit, as hereinbefore stated. By that or those deeds, Stokes conveyed the title to the real estate from himself, personally, to himself, as clothed in the robes of the corporation; and the same facts existed when he conveyed the title to the Fayette county

farm involved in this action; and the transaction, under the recited facts, as held in the case of Louisville Banking Company v. Eisenman, 94 Ky. 83, was in effect a conveyance from Stokes to Stokes.  Gleason testified that the corporation was primarily organized by Stokes to carry out an agreement between himself and his then wife, whereby he was to pay her a monthly allowance and the real estate was to be put into a holding corporation so that transfers could be made of it without the necessity of her relinquishing her inchoate right of dower, and the purpose, therefore, was one of convenience.  However, he further states that another corporation known as Onward Construction Company, the entire stock in which was also owned by Stokes, held the title to the Ansonia Hotel in New York, a building also owned by him, and it had placed a mortgage thereon and $100,000 was due thereon, and to obtain that amount of money with which to make the payment the Fayette county farm was conveyed to the defendant, Melvyn Realty Company, which executed notes for the $100,000.00, and with them as collateral security the amount necessary to make the payment was borrowed, and in that way it is claimed that a valuable consideration was paid, although the deed to the realty company was stamped as representing only a $50,000.00 consideration; and the property at that time, according to the lowest estimates of the witnesses, was worth at least as much as $150,000.00.  It does not appear whether the debt secured by the realty company's notes has or not been paid, nor indeed are we informed by anything appearing in the record as to whether the notes representing the $100,000.00 executed by the realty company have or not been paid, or where they are now. It does appear, however, that the substance of the whole transaction was, that the Ansonia Hotel, which defendant owned, but the title to which was in the Onward Construction Company, which he also owned, had a mortgage on it for $100,000.00, and to relieve that piece of property defendant obtained from the realty company, which he likewise owned, $100,000.00, the notes being executed by it to himself individually, and with them he borrowed the money to pay his debt on his hotel.  In other words, the transaction was a mere shifting of that debt from one piece of property in New York to another one in Kentucky, which might be upheld in favor of the Kentucky purchaser if the latter was not identical with Stokes and the transaction was otherwise *bona fide*.  By the deed at-

tacked in this case, the defendant divested himself of all
his corporeal property in this state, and that too at a time
when he was threatened with suit by a resident of Ken-
tucky with whom one of his associates was at the moment
trying to effect a satisfactory arrangement acceptable to
him and whereby the collection of the debt would be de-
ferred, but the outcome of the negotiations for that pur-
pose could not be foretold by defendant at that time.

Under the facts as recited, it is impossible for us to
discover any other purpose or intent on the part of Stokes
than to hinder and obstruct James in collecting his debt
should he carry out his threat to file suit. The whole
thing was a mere shifting of the title to the land from
Stokes, the living individual, to Stokes, the corporation,
and for the proven purpose to pay another debt of Stokes.
It clearly appears that if he actually needed the $100,000,
the Melvyn Realty Company held title to real estate in
New York greatly in excess of that amount, and which
it no doubt could have either sold or mortgaged for that
purpose. We have also not overlooked the remarkable
fact that a corporation with only $10,000.00 capital stock
(there being no proof that more than par was paid there-
for) could acquire and pay for the large amount of real
property held by it, and upon the whole record it requires
no philosopher to discern the intent and purpose of
Stokes in executing the deed in controversy. The de-
ceiving recitation as to the consideration stated in the
deed; the apparent inability of the corporation to buy
the property; the failure to record the deed until a long
while after its execution, and the inadequacy of the actual
consideration as testified to by Gleason are each of them
badges of fraud, and cast the burden upon the defendants
to show the *bona fides* of the transaction. Oldham's
Admr. v. Oldham, 141 Ky. 526; Sticks v. Calendar, 155
Ky. 806; Perry v. Krish, 157 Ky. 109, and Magic v.
Lewis, 164 Ky. 454. However, if those considerations
were eliminated there yet remains the fact, which is con-
clusively demonstrable from the evidence, that the con-
veyance was made in anticipation of a suit by James,
which is in itself sufficient to stamp the conveyance as at
least *prima facie* fraudulent. Allen v. Ligon, 175 Ky.
771, and other cases cited therein. If the conveyance
was voluntary (without consideration) a fraudulent in-
tent is not required under section 1907 of the Statutes
to entitle plaintiff to relief either as against the grantor
or the grantee, provided the property was such as could

be subjected. However, under the provisions of section 1906 of the Statutes, an intent to defraud on the part of the grantor is necessary, but the conveyance may not be attacked as against a grantee for a valuable consideration who had no knowledge of the grantor's fraudulent intent. International Shoe Co. v. Bowling, 201 Ky. 690.

We have seen in this case that the evidence in the light of the surrounding facts, proves a fraudulent intent on the part of Stokes, the grantor, and on the assumption that there was a valuable consideration for the deed, then the question to be determined is whether the grantee, defendant, Melvyn Realty Company, had knowledge of his fraudulent intent, which counsel for defense gravely insists was untrue. Their contention in that respect is to our minds so fallacious and unfounded as to embarrass us in an attempt to refute it. We are asked by counsel to hold that Stokes, as the sole and only stockholder in the corporation and the only one entitled to hold any office in it, did not know his intent and purpose as an individual dealing with himself as sole stockholder, which, if true, presents a puzzle more intricate and confusing than the proverbial Chinese one. It is so much so that we have determined to solve the question by holding that what Stokes individually knew he also knew as the sole owner of the corporation defendant.

But it is insisted on this branch of the case that plaintiff is not entitled to attack the conveyance because his notes were executed after it was made and that his rights are to be governed by those possessed by a subsequent creditor. In the first place we have already seen that Stokes was obligated for the debt from the time the leases were transferred and the note subsequently executed was but a change in the evidence of that debt. However, if we should disregard that fact and treat plaintiff's debt as having been created at the time of the execution of the notes, then under the provisions of section 1906 he would still have the right to set aside the conveyance and subject the property if the conveyance was actually fraudulent (as we have found it was), since in that case it was invalid as to subsequent creditors as well as prior ones. Lillard v. McGee, 4 Bibb, 165; Lowry v. Fisher, 2 Bush 70; Slater v. Sherman, 5 Bush 206, which is also true although there was a valuable consideration paid by the grantee, the Realty Company, provided it had actual knowledge of the grantor's fraudulent intent, which we have seen was true. Beadles v. Miller, 9 Bush 405; Sum-

mers v. Taylor, 80 Ky. 429; Huffman v. Leslie, 23 Ky. L. R. 1981, and Walters v. Akers, 31 Ky. L. R. 259.

Lastly, it is contended that since the proof shows the defendant, Stokes, to be solvent because of the property he owns in New York, the remedy resorted to by plaintiff can not be maintained although the conveyed property was all that Stokes owned in this jurisdiction. It is quite possible that the contention might be answered by saying that it is doubtful from the evidence whether defendant owns corporeal property in New York subject to execution sufficient to satisfy the debt sued on, since the larger part, if not all, of his real estate is held by his co-defendant, as hereinbefore stated, and perhaps if plaintiff should be relegated to that jurisdiction he would be compelled to adopt similar proceedings to this one, or a bill of discovery. But, however that may be, we are convinced that, because a defendant may possess property in some other jurisdiction or country upon the globe, he is not thereby entitled to fraudulently convey all of his locally situated property and which a local creditor is entitled to subject, so as to compel that creditor to go to a foreign jurisdiction to collect his debt. The statute prohibits any fraudulent conveyance "made with the intent to *delay, hinder* or defraud creditors," etc. It requires no argument to show that the effect of a conveyance, intended to place all of one's property in the local jurisdiction beyond the reach of the ordinary processes of law, is to delay and hinder. However, the text in 27 Corpus Juris, 725, in dealing directly with the question says: "The (attacking) creditor need not go beyond the jurisdiction to find other property." See also Alford v. Baker, 53 Ind. 279; O.'Brien v. Stamback, 101 Iowa 40, 63 Am. St. Rep. 368, and Rohrer v. Snyder, 29 Wash. 199, in which last case, upon the point under consideration, the opinion said: "A creditor, before he is permitted to attack a conveyance which he conceives to be fraudulent, is not obliged to search the entire world for unincumbered property out of which to make his debt. It is sufficient if he finds none within the jurisdiction of the court in which he seeks to set aside the fraudulent conveyance."

We, therefore, conclude that the court erred in dismissing the petition, and the judgment is reversed with directions to set aside the deed from Stokes to the Melvyn Realty Company and upon the execution of the bond required by section 410 of the Civil Code to order the land

attempted to be conveyed thereby sold for the purpose of paying plaintiff's debt with directions to apply the proceeds, first to the payment of the debt, interest and cost and the balance to be disposed of according to the directions of the court.