## Haber et al. v. Woods.

June 23, 1939.

Frank C. Malin and Halle, Harris, Haber & Berick for appellants.

288

Woods, Steward & Nickell, John T. Diederich and John Stanley for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER— Affirming.

William Meade owned the Meade Hotel Building located on Winchester Avenue in Ashland, Kentucky. He operated it as a hotel through the Meade Hotel Corporation, which was a closed corporation owned and controlled by him. About the time the business depression struck the nation Mr. Meade became in sore financial straits, and on April 20, 1928, he and his wife executed a mortgage on this hotel building to the Metropolitan Life Insurance Company for $115,000. By the terms of this mortgage Meade agreed to pay $2,300 semi-annually each June and December, and after making seventeen of these payments he agreed to pay the balance on June 1, 1938. Meade got behind in meeting these semi-annual payments and he was unable to pay the insurance and taxes on this building. Besides this mortgage to the Metropolitan Life Insurance Company he had executed a second mortgage on this property for $69,000 to John W. Woods, trustee, which $69,000 was made up of $40,000 Meade owed the Second National Bank of Ashland, Kentucky; $10,000 he owed to the Third National Bank of that city; $5,000 he owed to John W. Kitchen, who was then a vice-president of the Second National Bank of Ashland, and the remaining $14,000 of the second mortgage represented indebtedness to other banks and individuals having no direct or personal connection with this litigation. On December 4, 1929, Meade assigned the rents from the hotel building to John W. Woods, trustee, in order that Mr. Woods might pay the taxes and insurance from these rents and Mr. Woods allowed Meade a salary for operating the hotel of $200 per month out of the rents.

With these conditions confronting Meade, a real estate broker, David Haber, of the firm of Haber Brothers, of Cleveland, Ohio, got in touch with Meade and interested him in leasing the ground floor and basement of his hotel building to Scott Stores. By the last of September or the first of October, 1930, Haber brought to Ashland a Mr. Holmes, representing the real estate department of Scott Stores, to close the contract for the lease for a term of twenty years at a rental of $10,000 per annum for the first five years, $12,000 per annum for the second five years, $13,000 per annum for the third

five years, and $13,500 per annum for the fourth 5-year period. To close the deal Haber and Holmes met Meade in his hotel in Ashland and with Meade were John W. Woods, president of the Third National Bank of Ashland, who was trustee for the second mortgage holders to the extent of $69,000, John W. Kitchen, then vice-president of the Second National Bank of Ashland, and R. D. Davis, attorney and director for the Second National Bank.

It was not difficult for the parties to agree on terms of the lease as Scott Stores used a printed form of lease, but there was considerable discussion over the commissions to be paid Haber for making the deal. It was finally agreed Haber's commission was to be $4,000 and in the event the Scott Stores paid a bonus rent of $2,000 per year for three years, based upon the sales in this store exceeding certain figures, then there was to be an additional commission of $1,000 paid Haber. After reaching this agreement in the hotel as to the commissions to be paid Haber, the parties went across the street to Mr. Woods' office where he prepared the lease contract. Mr. Woods is not only a banker but a prominent lawyer of Ashland. In drawing the lease contract he inserted a clause, by agreement of all parties, making the rentals under the lease payable to himself as trustee for the landlord, Meade. After the lease was prepared Haber mentioned there should be some written memorandum signed setting out his commission. Haber then and there dictated a letter addressed to Haber's firm which was immediately put in type and signed by Meade and wife, and Woods, "agent for collecting rent for William Meade," which letter is as follows:

"Ashland, Kentucky,
"October 4, 1930.

"Haber Brothers,
"814 Leader Building,
"Cleveland, Ohio.

"Gentlemen:

"Writing you with reference to the commission, which you are to receive for securing a tenant for my premises in Ashland, Kentucky, same being 1524-1528 Winchester Avenue, I write this to say that you are to receive for this service the sum of Four Thousand ($4000.00) Dollars, to be paid as follows:

"Two Thousand ($2,000.00) Dollars six months after the beginning of the lease term and Two Thousand ($2000.00) Dollars twelve months after the beginning of the lease term. Said sums to be paid in cash and further you are to receive One Thousand ($1000.00) Dollars in addition to the above in case. the additional rental during the first three years of said term amounts to Two Thousand Dollars per year. Unless said additional rental brings me Two Thousand Dollars annually the first three years you are to receive only the first Four Thousand Dollars above mentioned.

"In the event a deal is completed between Scott Stores and the undersigned, the above sets out our agreement as to your commission.

> "Very truly yours,
> "William Meade
> "May Meade
> "J. W. Woods, agent for collecting rent for Wm. Meade."

The building had to undergo considerable repairs and it was not ready for occupancy by the Scott Store until March 1, 1931, at which time the rent started. On July 27, 1931, David Haber wrote Meade asking prompt payment of the $2,000 due September 1, 1931, on his commission. Meade replied thereto July 29th, saying the second mortgagee had thrown him into receivership and he was unable to pay. On August 5th, Haber wrote Woods, saying he was shocked to hear Meade was in receivership and sought to employ Woods to collect his commission. Woods replied the next day, saying Haber's commission was against Meade personally and he did not see any chance to collect it; that he was not in a position to handle Haber's claim as he represented the second mortgagees and should Haber assert a lien their interest might clash. August 27th, Haber directed a registered letter to Meade and wife and to Woods, agent, making a formal demand for the $2,000 of his commission due September 1, 1931, which letter appears not to have been answered. On August 24, 1933, plaintiffs brought this action at law against Meade and wife and Woods predicated on the letter addressed to plaintiffs October 4, 1930, and on September 29, 1934, plaintiffs filed an amended petition alleging Woods had col-

lected large sums of money in rents but had failed to apply any part thereof to the satisfaction of plaintiff's $4,000 commission. Meade having been adjudged a bankrupt in 1932 filed an answer pleading his discharge in bankruptcy as a bar to this suit. Mrs. Meade pleaded she signed the letter as surety and for the purpose of releasing her inchoate right of dower. Woods pleaded he was not personally bound by this letter and he only signed same to agree as agent for Meade that if the bonus rental of $2,000 per year were collected for three years, he, as such agent, would pay plaintiffs their $1,000 extra commission. On December 17, 1936, the day this action was set for trial, Woods filed an amended answer and counterclaim alleging that it was agreed between Haber and himself when he signed the letter of October 4, 1930, that Woods would not be liable personally for Haber's commissions and that he only obligated himself to pay the additional $1,000 commission as agent for Meade, in the event as such agent he collected the $6,000 bonus rent; and he asked that the letter of October 4, 1930, sued on be reformed so as to express the real agreement of the parties. Plaintiffs objected to the filing of this amendment, but the court overruled their objections and let it be filed, and transferred the cause to equity. Replies were filed and on December 17, 1936, the proof was heard orally before the chancellor and reported by the official reporter. On November 6, 1937, the chancellor rendered judgment holding the real contract between the plaintiffs and Woods was that Woods as agent for Meade agreed to pay plaintiffs an additional $1,000 commission in the event Woods as such agent collected the $6,000 bonus rent; that this bonus rent was never earned or collected, therefore, there was no liability on Woods, and plaintiffs' petition was dismissed.

The plaintiffs argue that Woods is personally liable for the $4,000 commission due them under the letter of October 4, 1930, and that the words "agent for collecting rent for William Meade" following Woods' signature are descriptio personæ, and they cite James v. Stokes, 203 Ky. 127, 261 S. W. 868; Sandmann v. Getty, 254 Ky. 496, 71 S. W. (2d) 954; Browning v. Park Hill Realty Company, 263 Ky. 636, 93 S. W. (2d) 358; Farmers' Bank & Trust Company v. Farmers' Supply Company, 244 Ky. 420, 51 S. W. (2d) 246. An examination of these cases shows the contract sued on in each of them

was a note, and the maker or endorser had written immediately following his signature "trustee," "manager," or some similar word denoting a representative capacity, and the court held such words were descriptio personæ and did not relieve the signer from liability. Most of these cases were controlled by Section 3720b-20, Kentucky Statutes (Negotiable Instrument Act), which reads in part:

> "But the mere addition of words describing him as an agent, or as filling a representative character without disclosing his principal, does not exempt him from personal liability."

In applying the rule of descriptio personæ and in holding the signer personally liable, courts have based their decisions either on the ground of failure to disclose the principal; or the wording of the instrument did not bind the principal and did bind the representative; or the representative had no authority to sign for the principal. See note in 42 L. R. A., N. S., 1; and Farmers' Bank & Trust Company v. Farmers' Supply Company, 244 Ky. 420, 51 S. W. (2d) 246. But it is not necessary to go into a thorough discussion of the question of descriptio personæ because Woods filed an amended answer asking that this contract be reformed to correct the mutual mistake of the parties. Where an attempt is made to bind one who has followed his signature by words denoting a representative capacity, a pleading that the instrument was the result of fraud or mutual mistake will authorize the introduction of parol evidence to show who was obligated by the instrument. 2 C. J. p. 674, Section 327; James v. Stokes, 203 Ky. 127, 261 S. W. 868.

We now turn to the evidence to ascertain what was the true agreement between these parties. David Haber testified Woods personally guaranteed the payment of the $4,000 commission due from Meade, and that Woods further agreed to pay the additional commission of $1,000 in the event he collected the $6,000 bonus rent and that Woods signed the contract to so bind himself. On the other hand, Woods, Meade, Mrs. Meade, Mrs. Lambert, Kitchen and Davis were all present when the question of commission was settled and when the letter-contract was written, and each of them is positive in his, or her, testimony that there was no agreement between Haber and Woods whereby Woods was to guarantee this

$4,000 commission. These six witnesses all testified that the only agreement made by Woods with Haber was that in the event the $6,000 bonus rent were collected by him as agent for Meade, he would pay the $1,000 additional commission to Haber. Plaintiffs argue that it is unreasonable to believe Haber would exercise so much concern over the $1,000 contingent commission which Woods agreed to pay out of the bonus rent, and then be so unconcerned as to the $4,000 certain commission as to let it remain unsecured when he knew of Meade's weak, if not insolvent, financial condition. True, this was most unusual conduct on the part of Haber. But it is no more unusual than for him to have written Woods on August 6, 1931, that he was shocked to learn Meade was in receivership; and although he called to Woods' attention the fact he had signed the agreement, yet this letter did not mention one word to Woods that he was liable for this commission. In that letter Haber inquired of Woods if he would accept employment to collect this $4,000 commission.

Counsel on both sides agree that before a chancellor may reform a contract for mutual mistake, the evidence must be clear and convincing that there has been such a mistake made. Thompson v. Security Insurance Company, 252 Ky. 427, 67 S. W. (2d) 493; Reiss v. Wintersmith, 241 Ky. 470, 44 S. W. (2d) 609; M. P. Brothers Co. v. Kirkpatrick's Adm'r, 214 Ky. 560, 283 S. W. 424, 425. But the fact that such evidence must be clear and convincing does not imply there can be no conflict therein, otherwise, it would be next to impossible to ever reform a writing. It is pointed out in Irwin v. Westwood Real Estate & Development Company, 200 Ky. 760, 255 S. W. 546, that the "clear and convincing proof" is not confined to the testimony of witnesses, but it may be developed by the documents, circumstances and facts proven on the entire case.

Woods was familiar with Meade's affairs and knew of the mortgage he executed to the Metropolitan Life Insurance Company on April 20, 1928, which provided for $4,600 to be paid yearly on the principal, in addition to the interest on more than $100,000. On December 4, 1929, Woods had entered into a contract with Meade whereby Meade turned over to Woods all rents and income from his hotel (except $200 per month living expenses), to be used in the payment of the installments and interest provided in the mortgage of the Metropoli-

tan; and on December 1, 1929, Woods advanced Meade money to meet the amounts due the Metropolitan on its mortgage and to pay his taxes and insurance which was then due. Woods knew these items would consume all the rent received from the Scott Stores and he knew that in effect this rent had been allocated by written contracts Meade had signed previous to entering into the lease with Scott Stores. But this bonus rent of $6,000 in the event the sales of the Scott Stores exceeded certain figures during the first three years of their lease, was a different matter. It was a contingency which could not be taken into consideration in applying the regular and certain rent on Meade's current and pressing obligations. As this bonus rent was to come through Woods' hands, it is reasonable to believe he agreed with Haber to sign the letter-contract to bind himself only as Meade's agent to pay $1,000 of it to Haber if it were collected by him, and that the parties agreed Woods was not otherwise bound. Taking into consideration that six witnesses testified that the agreement between Haber and Woods was that Woods was only to be bound by the writing to pay Haber the $1,000 additional commission out of the bonus rent, if he collected it as agent of Meade, and that only Haber testified that Woods agreed to be personally bound for the $4,000 commission due from Meade to Haber; and taking into consideration the documentary evidence, and the facts and circumstances surrounding the entire case, we are not prepared to say the chancellor was not justified in reforming the contract.

Plaintiffs by an amended petition allege Woods has collected large sums in rents and has failed to apply any part thereof to the payment of their commission. They seek to hold Woods personally liable on the theory that where an agent collects money that his contract requires him to pay over to certain persons and he fails to do so but pays the money to others, he becomes personally liable. But this contract did not require Woods to pay this $4,000 commission out of the rents he collected. On the contrary, the annual installment due on the principal of the mortgage of the Metropolitan, together with interest thereon, the taxes, and insurance due on the building, consumed this entire rental. There is no evidence in the record that Woods misapplied any of this rent, and even if plaintiff's petition were sufficient to charge Woods with being personally liable for money he

wrongfully misapplied as agent, Woods cannot be held liable in the absence of such evidence.

The judgment is affirmed.

Whole Court sitting.